**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Joel Torres SALAS,
Defendant–Appellant.**

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Vincente Flores MUNOZ,
Defendant–Appellant.**

Nos. 88–3221, 88–3228.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 1, 1989.

Decided June 19, 1989.

Michael P. Ruark, Breskin & Robbins, Seattle, Wash., for defendant-appellant, Joel Torres Salas.

William T. Hines, Asst. Federal Public Defender, Seattle, Wash., for defendant-appellant, Vincente Flores Munoz.

Jerry Diskin, Asst. U.S. Atty., Seattle, Wash., for plaintiff-appellee.

Before ALARCON, FERGUSON and THOMPSON, Circuit Judges.

ALARCON, Circuit Judge:

Vincente Munoz (Munoz) and Joel Torres Salas (Salas) appeal from the order denying their motions to suppress evidence introduced at trial on the issue of guilt. Each was found guilty of possessing more than five hundred grams of cocaine with intent to distribute. The evidence was seized pursuant to two search warrants. Munoz and Salas contend that the first search warrant was invalid because it was issued on the basis of facts obtained as the result of unreasonable searches and seizures. Munoz challenges the validity of the second warrant on the ground that it was issued in reliance upon evidence seized during the execution of the first warrant. We conclude that each search warrant was valid and affirm.

The validity of the first search warrant depends primarily upon whether the officers were justified in conducting a pat-down search in connection with a *Terry* stop. A detailed recitation of the facts known to the officers prior to the pat-down is necessary to resolve this question.

## I

### PERTINENT FACTS

The evidence presented by the government at the hearing on the motion to suppress disclosed the following facts:

#### A. *Citizen Informants' Reports*

Detective Christopher A. Hurst of the Tukwila Police Department testified that he had been a police officer for eight years. During that time he had investigated narcotics cases since 1982. At the time the searches in this matter occurred, he was assigned to the South King County Narcotics Task Force.

On February 22, 1988, the Renton Police Department advised the South King County Narcotics Task Force that a maid at Nendel's Motel at 3700 East Valley Road had reported that she had seen cocaine and marijuana and "packaging materials" on several occasions while cleaning Room 227.

On the same date, Detective Hurst and Detective Kevin Lee Milosovich of the Renton Police Department went to Nendel's Motel to investigate this report. The motel

manager informed the officers that two Spanish or Mexican men were staying in Room 227. She also reported that a black 1974 Corvette, license number 102 AHN, was associated with the men in Room 227. Detective Hurst checked the license number of the car with the Department of Licensing. The Corvette was registered to Vincente Munoz.

After interviewing the motel manager, the officers kept Room 227 under surveillance for a period of time. They did not observe any activity involving Room 227 or the Corvette.

The following morning, Detective Hurst interviewed a maid who worked at the motel. She reported that she had cleaned Room 227 on February 20, 1988. On that date, she observed a balance scale that was about one foot in length, a sandwich-size package of baggies, and a box of baking soda.

Detective Hurst testified that sandwich-size baggies are used for the packaging of cocaine. Baking soda is used in the production of rock or crack cocaine.

The maid also saw a large amount of white powder she identified as cocaine. She had previously seen cocaine on numerous occasions at parties. She also observed burnt material that she identified as marijuana. She recognized the substance as being marijuana because of its appearance and smell based on her experience as a user of this contraband.

She also saw a large quantity of new clothing still affixed with store tags. Detective Hurst testified that new clothing is bartered for narcotics.

Detective Hurst next interviewed a second maid. She stated she had seen narcotics in Room 227 on three separate days, most recently on February 19, 1988. She saw approximately two hundred and fifty dollars' worth of five-and-ten dollar bills. She also informed Detective Hurst that she saw white powder on top of the television set. It was scooped together in short lines. She described this substance as similar to cocaine she had seen other people use. Approximately two weeks before the interview, she had seen marijuana in Room 227.

She stated she had used marijuana and recognized it when she saw it and smelled it.

The second maid also saw ziplock plastic bags and a suitcase in Room 227 covered with a comforter. She thought that it was unusual to hide luggage in this manner.

Detective Hurst presented these facts to a county prosecutor in order to obtain a search warrant. The prosecutor advised him that he should continue his surveillance for additional information because the maids had removed the narcotics when they cleaned the room and their information was stale.

### B. Independent Observations

#### 1. Evasive Action

Detective Hurst and Milosovich returned to Nendel's Motel at 8:30 p.m. on February 23, 1988. They observed the 1974 Corvette in the parking lot. They obtained a key to Room 225. On their way to that room they saw Munoz and Salas enter the Corvette and drive off. The officers followed in their vehicle.

The Corvette traveled north on State Route 169 until they reached the Interstate 405 exit. As the officers followed Munoz and Salas into the exit, the Corvette pulled over to the side halfway up the cloverleaf. The officers continued on past the Corvette to avoid revealing to Munoz and Salas that they were being followed. The officers drove through the entire cloverleaf to position themselves behind the Corvette. They caught up with the Corvette near an exit in Seattle.

Detective Hurst testified that stopping the Corvette on the cloverleaf was a good evasive driving tactic to determine whether someone is following you. If a person is being followed by the police, the officers must continue on or be discovered. If the officers continue on, they must travel the entire cloverleaf to catch up.

#### 2. Apparent Delivery of Narcotics

The Corvette was driven to an address near 19th and Ferdinand. The Corvette

stopped in front of a residence. Munoz and Salas left the car. The officers drove to a side street and turned around. This maneuver took one minute. The officers then saw Munoz and Salas leaving the residence.

The officers followed the Corvette from the residence. At a traffic signal, one of the individuals in the car waved at the officers. The surveillance was discontinued because Detective Hurst was convinced that their surveillance had been compromised.

Detective Hurst concluded that the fact that Munoz and Salas had stopped at a residence for one minute was consistent with a delivery of narcotics.

The detectives returned to their office and conferred with Sergeant Robert Sheldon Almy of the Auburn Police Department about the evasive driving and the possible delivery of narcotics. The officers decided to return to Nendel's Motel and question Munoz and Salas when they returned.

### 3. *The Pat–Down Search*

When the officers arrived at Nendel's Motel, they discovered that Munoz and Salas had already arrived. Detective Hurst went to Room 225. Detective Milosovich and Sergeant Almy waited in the parking lot. The officers agreed that Detective Hurst would radio Detective Milosovich and Sergeant Hurst when Munoz and Salas left the room. They determined that it would be safer to contact the suspects in the open rather than interviewing them in their room. Detective Hurst heard two persons speaking in Spanish in Room 227. After a short time, at approximately 10:30 p.m., he heard the door open and the sound of footsteps going down the hallway. Detective Hurst used the radio to inform his fellow officers that the suspects were on their way.

Detective Hurst waited 20 to 30 seconds so as not to run into the suspects, and then proceeded to the parking lot.

In fact, Munoz did not leave Room 227. Salas went to the parking lot and entered the Corvette, sat behind the wheel, and appeared to insert a key into the ignition switch.

Detective Milosovich and Sergeant Almy approached the vehicle with their weapons drawn. After identifying themselves as police officers, Salas was ordered to step out of the Corvette. Salas was asked to identify himself. He did not respond. Sergeant Almy asked Salas if he was armed. Salas replied that he was not. Sergeant Almy advised Salas that he was going to check to see if he was armed. The suspect turned to a 45–degree angle, put his hands up and locked his fingers behind his head. Sergeant Almy then patted him down. Salas was wearing a two-piece warm-up suit consisting of sweat pants and a jacket with pockets. During the pat down, Sergeant Almay felt a bulge and a lump near the right jacket pocket. Sergeant Almy believed that the bulge might be the butt of a hand gun in Salas' waistband. Instead, Sergeant Almy found a baggie containing 14 grams of rock cocaine.

### 4. *The Entry into Room 227.*

When Detective Hurst noted Munoz was not in the parking lot, Salas was moved away from the Corvette to a place where he could not be seen from Room 227. Detective Hurst asked Salas if anyone else was in Room 227. Salas stated that no one else was in the room.

The officers conferred about their next move. They concluded that if Salas did not return shortly, Munoz would destroy any evidence in the room. They were aware that obtaining a search warrant would take three hours. The officers decided to go to Room 227 and remove Munoz so that the room would be secure while a search warrant was obtained.

A pass key was obtained from the motel manager. They opened the door to Room 227 without first knocking or identifying themselves. Munoz was in the room smoking cocaine. Detective Hurst observed cocaine and narcotics paraphernalia in plain view. Munoz was placed under arrest and moved to the hallway.

That same evening, while Sergeant Almy stood outside Room 227 to preclude entry,

Detective Hurst applied for a search warrant. In the affidavit, Detective Hurst set forth the information he received from the motel manager and the maids concerning the presence in Room 227 of cocaine and materials used in packaging that substance for sale as recently as Saturday February 20, 1988. The affidavit also related his independent observations concerning the Corvette's evasive driving maneuvers and the discovery of a baggie of cocaine during the pat-down search of Salas. In addition, Detective Hurst alleged in his affidavit that after entering Room 227 by means of a pass key, he "noted a quantity of white powder substance was on the counter as well as other drug related items." Detective Hurst described the items he observed in plain view as follows: "cocaine, baggies, baking soda, and other drug-related items." After reviewing Detective Hurst's affidavit, a magistrate of the Renton District Court for King County issued a warrant for the search of Room 227 and the 1974 Corvette. Armed with the search warrant, Detective Hurst returned to Nendel's Motel at approximately 1:30 a.m. to conduct a search of Room 227. A search of a suitcase disclosed a large quantity of cocaine. Part of the cocaine was in a brick form. It appeared to have weighed about a kilo before part of it was removed. Detective Hurst also found a number of one-ounce and half-ounce packages of cocaine. Packaging material including tin foil and plastic bags were also found. In addition, Detective Hurst found a key to Room 27 of the Aero Motel.

The Aero Motel is located at 7240 East Marginal Way, South Seattle. After this key was discovered, Detective Milosovich obtained a warrant to search Room 27 of the Aero Motel. A search of that location produced cocaine and pornographic photographs.

Following his arrest and indictment, Munoz filed a motion to suppress "all evidence" seized from Room 227 of Nendel's Motel and Room 27 of the Aero Motel. Salas moved to suppress the cocaine discovered during the pat down that occurred prior to his arrest in the parking lot at Nendel's Motel at 10:30 p.m. on February 23, 1988, and the evidence seized in Room 227. Each motion was denied.

## II

### ISSUES ON APPEAL

Before we set forth our discussion on the issues presented in this appeal, we note that the parties made certain concessions that narrow our review of the conduct of the officers in this matter.

Salas concedes that the information known to the officers prior to asking him to step out of the 1974 Corvette established "reasonable suspicion to believe that criminal activity had occurred" in Room 227 sufficient to justify his detention. Brief of Appellant Salas, pg. 4. Pursuant to the standard set forth in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the district court concluded that "the officers' initial warrantless entry of Room 227 was not justified by exigent circumstances." The government has advised this court that it does "not dispute the District Court's finding that the initial entry into Room 227 was unlawful." Brief for Appellee, page 22. We accept these concessions but express no opinion respecting the legality of these events.

Salas seeks reversal of the order denying his motion to suppress on two grounds:

One. The officers did not have knowledge of sufficient facts prior to conducting the pat-down search to support a reasonable belief that he might be armed or dangerous.

Two. Because the affidavit filed in support of the warrant for the search of Room 227 was based on information obtained as the result of a prior illegal entry, all the evidence seized therein was tainted and inadmissible.

Munoz also challenges the validity of the warrant for the search of Room 227 at Nendel's Motel as the product of an illegal entry. In addition, he argues that the information obtained during the search of Room 227 was improperly relied upon by the Magistrate in issuing a warrant for the search of Room 27 of the Aero Motel.

## III

## DISCUSSION

We review the legality of a detention and pat-down search independently and without deference to the legal conclusions of the district court. *United States v. Thomas,* 844 F.2d 678, 680 & n. 2 (9th Cir.1988); *United States v. Maybusher,* 735 F.2d 366, 371 n. 1 (9th Cir.1984), *cert. denied,* 469 U.S. 1110, 105 S.Ct. 790, 83 L.Ed.2d 783 (1985). We uphold "findings of fact made at a suppression hearing ... unless clearly erroneous." *United States v. Limatoc,* 807 F.2d 792, 794 (9th Cir.1987). We determine whether there was a founded suspicion for a pat-down search based on a totality of the circumstances. *United States v. Thomas,* 844 F.2d 678–81 (9th Cir.1988).

### A. *The Pat–Down Search*

Law enforcement officers may conduct a search for weapons during the limited detention authorized by *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889.

> The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate or unparticularized suspicion or "hunch," but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.

*Id.* at 27, 88 S.Ct. at 1883 (citations and footnote omitted).

■ The officers' testimony concerning the particularized facts known to them prior to the pat-down search amply demonstrated that it was reasonable to assume that Salas was armed and dangerous. Two citizen informants had reported that three days earlier that they had observed cocaine and materials used in packaging that substance for sale in Room 227. Because the cocaine, observed by one of the maids, was spread out in lines, it was reasonable for the officers to assume that at least one of the occupants of Room 227 used cocaine. Salas and Munoz earlier that evening had driven the Corvette evasively on their way to what appeared to be a delivery of narcotics. It was reasonable to infer from the information received from the citizen informants and the officers' personal observations that Salas was a narcotics dealer. In *United States v. Post,* 607 F.2d 847, 851 (9th Cir.1979), we held that "[i]t is not unreasonable to assume that a dealer in narcotics might be armed." It was also reasonable for the officers to suspect that Salas might be dangerous if he had recently used cocaine.

Prior to the pat down, Salas had been seated in the Corvette. The Supreme Court has recognized that "investigative detentions invoking suspects in vehicles are especially fraught with danger to police officers." *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). A weapon can be concealed under the seat of a vehicle. It is readily accessible to be used to harm any police officer who approaches an automobile especially at 10:30 p.m., when a hand movement to a weapon may be masked by the night's shadows.

■ The district court found that Salas' warm-up suit could conceal a weapon. This finding is not clearly erroneous. Sergeant Almy confined his search to the outer surfaces of Salas' clothing. Once he felt a hard object he believed could be the butt of a handgun, he had reasonable grounds to reach inside Salas' jacket to remove the object. *Terry v. Ohio,* 392 U.S. at 29–30, 88 S.Ct. at 1883–84; *See also United States v. Thomas,* 844 F.2d at 685 (citation omitted) ("The physical appearance of a suspect may be significant if ... the officer sees a suspicious bulge on the suspect's body or the clothes worn by the suspect could easily hide a weapon.") We conclude that the limited search conducted by Sergeant Almy was reasonably warranted by the totality of the facts and circumstances known to him prior to detaining Salas.

■ Without citation to relevant authority, Salas appears to argue that the mere fact that the officers had drawn their

weapons before stopping him exceeded the scope of a concededly valid *Terry* stop. We disagree. The Supreme Court has instructed that "the policeman making a reasonable investigatory stop should not be denied the opportunity to protect himself from attack by a hostile suspect." *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972).

A similar contention was made in *United States v. Russell*, 546 F.2d 839 (9th Cir. 1976). In *Russell*, as in the matter before this court, the parties conceded that the investigatory stop was based on a well founded suspicion. *Id.* at 840. The appellant in *Russell* argued, however, that the drawing of weapons prior to the stop was not justified. *Id.* We responded that "[t]he officers would have been foolhardy not to have weapons ready at this hour and location...." *Id.* In the *United States v. Taylor*, 716 F.2d 701 (9th Cir.1983), we held that under the totality of the circumstances known to the officers, they were justified in making a *Terry* stop. *Id.* at 708. We also concluded that "[w]hen the officers stopped Taylor and his apparent confederate, Pressler, *to question them*, ... the officers were justified in drawing their weapons in self-protection." *Id.* at 708. (emphasis added).

No firearms were pointed at Salas prior to the stop. In fact, there is no evidence in this record that Salas saw the officers weapons. Thus, it has not been demonstrated that his subjective freedom of movement was affected in any manner by the officers' armed approach. Sergeant Almy testified he placed his weapon "down my right leg." Detective Milosovich placed his weapon "behind [his] right thigh" out of Salas' sight. Under the totality of the circumstances in this case, the officers' drawn but concealed handguns did not taint the validity of this investigatory stop. The district court did not err in denying the motion to suppress the cocaine seized from Salas' person.

### B. *Validity of the Search Warrant for Room 227*

■ The district court concluded that the officers had probable cause to arrest Mu-

noz prior to entering Room 227. We agree. The report of the citizen informers that cocaine and materials for packaging narcotics had been observed in Room 227 on February 22, 1988 which was corroborated by the personal observations of the officers including the discovery of cocaine on Salas' person, clearly established that probable cause existed to arrest Munoz. The district court also concluded, however, that the officers failed to articulate sufficient exigent circumstances to justify a warrantless entry into Room 227 to make an arrest or to prevent the destruction of property. Absent exigent circumstances, a warrantless entry to make an arrest is prohibited. *Payton v. New York*, 445 U.S. 573, 576, 100 S.Ct. 1371, 1374, 63 L.Ed.2d 639 (1980).

The district court also determined that the entry was illegal because the officers failed to comply with state and federal "knock and answer" rules. 18 U.S.C. § 3109 (1982), Wash.Rev.Code § 10.31.040 (1980). As we noted above, the government concedes the illegality of the initial entry into Room 227.

Salas and Munoz argue that given the illegality of the initial entry, the warrant issued for the search of Room 227 was invalid because the affidavit set forth observations made by Detective Hurst of cocaine and other objects in plain view during Munoz's arrest.

■ The district court denied the motions to suppress based on its conclusion that if all reference to the items seen in plain view by the officers after the initial entry is deleted, Detective Hurst's affidavit "still contains sufficient untainted facts to establish probable cause for the warrant to issue." The district court concluded further that "[t]his [untainted] information and the resulting lawful warrant constitute an independent source for the evidence found in Room 227." In *Segura v. United States*, 468 U.S. 796, 799, 104 S.Ct. 3380, 3382, 82 L.Ed.2d 599 (1984), the Supreme Court held that a search was valid notwithstanding the fact that an earlier illegal entry had been made on the premises because the warrant was issued "wholly on

information known to officers before the entry into the apartment...." The court concluded that the exclusionary rule was inapplicable because the government had discovered the existence of the items described in the search warrant from an independent source. *Id.* at 805, 104 S.Ct. at 3385.[1]

Salas contends that there was no independent source for the issuance of the search warrant. He argues that the officers "had applied for a search warrant and had been refused." Brief of Appellant Salas, pg 8. This argument mischaracterizes the evidence. The officers did not apply to a magistrate for the issuance of a search warrant prior to the discovery of cocaine on Salas' person. The record does show that prior to the lawful detention of Salas, a county prosecutor had advised Detective Hurst to continue his surveillance for additional information. Thereafter, the officers' personal observations including the seizure of cocaine from Salas' jacket corroborated the information they had received from the employees at Nendel's Motel.

Salas also asserts that Detective Hurst's affidavit contained tainted evidence that was the fruit of the initial illegal entry. In *United States v. Driver*, 776 F.2d 807 (9th Cir.1985), we held that, "[t]he warrant may be upheld even where it contains tainted and untainted facts as long as the untainted portions contain a sufficient showing of probable cause to render the warrant valid."

The district court concluded that, after deleting all references to the objects seen by the officers at the time Munoz was arrested, the untainted information known to the officers prior to the initial entry into Room 227 derived from an independent source and constituted sufficient facts to establish probable cause for the warrant to issue. We agree with the district court's application of *Driver* to the facts set forth in Detective Hurst's affidavit.

Munoz requests that "this Court review its decision in *Driver.*" Opening Brief of Appellant Munoz, pg. 7. He argues that "*Segura* does not compel nor permit the result reached in *Driver.*" *Id.* He also asserts that "[a] search warrant issued on an affidavit containing both tainted and untainted information cannot serve as an independent source." *Id.* at 10. This argument is clearly contrary to the law of this circuit. A three-judge panel of this court cannot disregard or overrule a prior decision of this court. *C.B.S. v. United States Dist. Court for Cent. Dist. of Cal.*, 729 F.2d 1174, 1177 (9th Cir.1984) (court bound to follow prior panel as controlling Ninth Circuit precedent); *State of Mont. v. Johnson*, 738 F.2d 1074, 1077 (9th Cir.1984) (this court bound by decision of prior panels). Applying *Driver* to the *untainted* facts set forth in Detective Hurst's affidavit, we conclude that probable cause derived from an independent source supported the issuance of a warrant to search Room 227.

Salas contends that we must reverse the denial of his motion to suppress because "there is no doubt that the magistrate relied upon the evidence seen in the room" following the initial entry. Brief of Appellant Salas, pg. 9. Salas argues that *Murray v. United States*, — U.S. —, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988) supports this argument.

In *Murray* the Supreme Court held that the independent source rule authorizes the seizure of evidence observed in plain view during an earlier illegal entry. *Id.* 108 S.Ct. at 2535–36. Where officers have observed evidence in plain view after an illegal entry, and prior to obtaining a search warrant, the Supreme Court instructed that

> [t]he ultimate question, therefore, is whether the search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence at issue here. This would not have been the case if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during

---

**1.** We review a magistrate's determination that probable cause existed to issue a search warrant independently of the conclusion reached by the district court. *United States v. Castillo*, 866 F.2d 1071 (9th Cir. 1989).

that entry was presented to the magistrate *and affected his decision to issue the warrant.*

*Id.* (emphasis added) (footnote omitted).

In *Murray*, the court vacated the judgment and remanded to the Court of Appeals with instructions that it direct the district court to determine whether "the warrant-authorized search of the warehouse was an independent source of the challenged evidence." *Id.* at 2536.

In the instant matter, the district court expressly concluded that the untainted information known by the officers "and the resulting lawful warrant constitute an independent source for the evidence found in Room 227." Memorandum Decision on Motions to Suppress Evidence, page 10. The district court's conclusion is supported by the record. The evidence that the officers had decided to obtain a search warrant *prior* to entering Room 227 is uncontradicted. Detective Hurst testified that the officers conferred after Salas was arrested for possession of cocaine.

> At that point in time we discussed the situation. I talked to Sergeant Almy and Detective Milosovich, we realized we had more than enough for a search warrant obviously in light of what we had seen and what we found.
>
> But we were faced with a tactical situation of sorts, in that the soonest we could get a search warrant was three hours under the system we normally work with.
>
> We knew that there was another individual in the room and we felt that if Mr. Salas did not return in a short amount of time from making his delivery, the other individual in the room would know something was wrong and in fact any evidence that might be in there would be destroyed.
>
> We decided that it was a decision that had to be made fairly quickly. We decided to go to the room and secure the other person from the room so the room would be secure while we were obtaining our search warrant.

This testimony clearly shows that the officers' decision to seek a search warrant was not prompted by the evidence they observed in plain view during their initial illegal entry.

Detective Hurst testified that he spoke to the magistrate about the *Terry* stop, the pat down, and the initial entry into the room. The magistrate told Detective Hurst that "in his opinion they were clearly justified." Munoz argues that "[g]iven this testimony, it would be difficult to conclude that the magistrate placed no reliance upon the tainted information that was contained in the affidavit." Opening Brief of Appellant Munoz, pg. 15. We disagree. The magistrate's comments were confined to events that occurred prior to the observations of cocaine and other objects within Room 227. Contrary to Munoz's assertion, there is no evidence in the record that would support an inference that the magistrate's decision was affected by the brief reference in Detective Hurst's affidavit to what the officers observed at the time of Munoz's arrest in Room 227.

■ In *Murray*, the Supreme Court explained that the exclusionary rule should not be invoked to place law enforcement officers in a worse position than if the illegal conduct had not occurred. *Id.* at 2525. Had the officers in this matter waited outside the motel room while the warrant was obtained, the search of Room 227 would have been valid based on the information from the citizen informants and the officer's independent observations including the seizure of cocaine from Salas' person. Excluding the evidence seized in Room 227 solely because the officers erred in concluding that their initial entry was justified to prevent destruction of the evidence would place them in a worse position than if they had not blundered. Exclusion of the evidence under these circumstances is precluded by *Murray*.

## C. *The Search of Room 27*

Munoz contends that the warrant obtained for the search of Room 27 of the Aero Motel was based upon information gained from the illegal search of Room 227 at Nendel's Motel. No other invalidity is asserted.

■ The search of Room 227 at Nendel's Motel conducted pursuant to the warrant was valid and not tainted by the initial entry. Accordingly, the search of Room 27 of Aero's Motel based on evidence discovered in the search of Room 227 was also valid.

## CONCLUSION

The Supreme Court decided *Murray* after our decision in *Driver*. In *Murray*, the affidavit did not mention the illegal entry or the officer's observation of bales of marijuana in plain view. *Murray*, — U.S. —, 108 S.Ct. at 2532. The magistrate in *Murray* did not review an affidavit that contained tainted and untainted evidence. *Id.* In *United States v. Holzman*, 871 F.2d 1496 (9th Cir.1989), we applied *Murray* in a case where the officers did not present information to the magistrate obtained during an unlawful entry, and remanded to the district court for a determination whether a warrant would have been sought had an illegal entry not been made. *Id.* at 1514. Thus, the issue squarely presented to this court in *Driver* was not before the Supreme Court in *Murray* nor discussed by us in our *Holzman* decision. The Supreme Court, however, anticipated the mixed affidavit problem we confronted in *Driver*. The Court commented that where tainted evidence was presented to a magistrate, the warrant would be invalid if the fruit of the illegal conduct affected the decision to issue it. *Id.* 108 S.Ct. at 2535–36.

The undisputed testimony in the record before this court shows that the magistrate concluded that probable cause existed to believe that Munoz and Salas were engaging in narcotics activities in Room 227 based on information known to the officers before the initial entry. There is no evidence in the record that would support a finding that the magistrate's decision to issue the warrant was affected by the plain view observations of the officers after their initial entry. The district court also determined that probable cause existed prior to the entry of Room 227. We have conducted an independent review of the record. We also conclude that Detective Hurst's affidavit sets forth facts showing that probable cause existed to search Room 227 from a source independent of the observations of the officers after the initial entry.

AFFIRMED.

FERGUSON, Circuit Judge, concurring in part and dissenting in part:

I believe that the frisk of Salas exceeded the outer limits of a permissible weapons search under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Therefore, I dissent from that portion of the majority opinion affirming the district court's denial of Salas' motion to suppress the cocaine seized from his person during that search.[1]

Striking a balance between concern for the safety of law enforcement officers and the personal intrusiveness of a pat-down search, the Supreme Court in *Terry* recognized narrow authorization for a law enforcement officer to conduct, for his own protection and safety, a limited pat-down for weapons "where he has reason to believe he is dealing with an armed and dangerous individual." *Id.* at 27, 88 S.Ct. at 1883; *see also Ybarra v. Illinois*, 444 U.S. 85, 93, 100 S.Ct. 338, 343, 62 L.Ed.2d 238 (1979); *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972); *Sibron v. New York*, 392 U.S. 40, 64, 88 S.Ct. 1889, 1903, 20 L.Ed.2d 917 (1968). The inception and scope of a *Terry* frisk thus remains strictly limited to its self-protective function. As the Supreme Court has cautioned, nothing less than a particularized belief that a person poses an immediate threat will provide the legal foundation for a pat-down of that individual for weapons:

1. Since Munoz challenges the denial of his suppression motion based on alleged taint in the search warrant stemming from the illegal entry into Room 227 at Nendel's Motel, rather than from the parking lot search of Salas, I concur in the majority opinion to the extent that it affirms the district court's judgment with respect to Munoz.

Nothing in *Terry* can be understood to allow a generalized 'cursory search for weapons' or, indeed, any search whatever for anything but weapons. The 'narrow scope' of the *Terry* exception does not permit a frisk for weapons on less than reasonable belief or suspicion *directed at the person to be frisked* [.] *Ybarra*, 444 U.S. at 93, 94, 100 S.Ct. at 343 (emphasis added).

The majority runs afoul of this fundamental *Terry* principle by holding that the record in this case "amply demonstrate[s]" that Officer Almy had reason to believe Salas was armed and dangerous prior to conducting the pat-down search. In reaching this conclusion, the majority misreads the record and cites several facts, including the fact that Salas was seated in an automobile when confronted by the officers, the late hour of the stop, and the possibility that Salas had recently ingested narcotics, which stated facts, in actuality, played no part in Officer Almy's decision to search Salas. Officer Almy unequivocally testified at the suppression hearing that he had premised Salas' weapons search *solely* on the fact that Salas was the subject of a "narcotics investigation." [2]

. Thus, to uphold Salas' search in this case is to sanction a *Terry* weapons search based on nothing more than generalized suspicions concerning a person's involvement in narcotics activities. Blanket generalizations about the nature of certain crimes, however, fail to provide that specificity of information which is the hallmark of Fourth Amendment jurisprudence. *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981); *Terry*, 392 U.S. at 21 n. 18, 88 S.Ct. at 1880 n. 18. While experience suggests that the strong likelihood of certain narcotics traffickers carrying or possessing firearms of-

ten creates safety concerns sufficient to justify a *Terry* weapons search, *see, e.g., United States v. Pajari*, 715 F.2d 1378, 1383–84 (8th Cir.1983) (detention and frisk of suspect valid when officers approached defendant with reason to believe they were confronting a "major narcotics dealer"); *United States v. Post*, 607 F.2d 847, 850–51 (9th Cir.1979) (not unreasonable to assume that drug suspect listed on DEA computer might be armed and dangerous); *United States v. Oates*, 560 F.2d 45, 59 (2d Cir. 1977) (reasonable to base suspicions that suspect armed and dangerous in part on his reputation as a "major narcotics dealer" in the Detroit area); *United States v. Santana*, 485 F.2d 365, 368–69 (2d Cir.1973), *cert. denied*, 415 U.S. 931, 94 S.Ct. 1444, 39 L.Ed.2d 490 (1974) ("[I]t would not be unreasonable to assume that a man believed to be the one of the top narcotics violators in the New York area would be carrying arms or would be otherwise violent."), it emasculates *Terry*'s specificity requirement to condone weapons searches for any or all subjects of "narcotics investigations" whatever their level of suspected criminal conduct or propensity for violence. *See United States v. Ceballos*, 654 F.2d 177, 184 (2d Cir.1981) (generalization that narcotics traffickers frequently armed and violent, without more, insufficient to justify *Terry* weapons search); *see also Ybarra*, 444 U.S. at 93, 100 S.Ct. at 343; *United States v. Santillanes*, 848 F.2d 1103, 1108 (10th Cir.1988); *United States v. Thomas*, 863 F.2d 622, 629–30 (9th Cir.1988). Given the absence of any information suggesting that the officers believed they were dealing with prominent drug traffickers, or traffickers associated with other drug dealers harboring known violent tendencies, I cannot join in the majority's inferential leap that Salas posed a credible threat of armed and dangerous behavior. [3]

**2.** During the Salas–Munoz joint suppression hearing, the following exchange took place between Officer Almy and the Assistant U.S. Attorney:

> Q. Did any other circumstances, besides this was a narcotics investigation, contribute to your concern, such as the time of day?
> A. No, it did not.

> Q. That was just it, just the narcotics investigation?
> A. That's correct.

**3.** Neither the statements made by the Nendel Motel maids, nor the officers' first-hand observations, bore any evidence that Salas or Munoz possessed or carried weapons. Moreover, as the "narcotics investigation" of Salas and Munoz commenced at the behest of the manager of

It is not surprising that the majority's deferential approach to justifications for *Terry* weapons searches finds comfort in this case involving illicit narcotics activities. Invoking the metaphors and images of battle, the government's "war on drugs" has already made casualties of constitutional protections and personal dignity. *See National Treasury Employees Union v. Von Raab,* —— U.S. ——, 109 S.Ct. 1384, 1401, 103 L.Ed.2d 685 (1989) (Scalia, J., dissenting). However laudable the underlying goal of eradicating drugs from our society, we must ensure that we do not also eradicate the Fourth Amendment in the process of serving that goal—worthy aims alone do not create reasonable searches. The Supreme Court's admonition in *Terry* against affixing judicial imprimaturs on governmental conduct that invades core Fourth Amendment values bears repeating:

> Under our decision, courts still retain their traditional responsibility to guard against police conduct which is overbearing or harassing, or which trenches upon personal security without the objective evidentiary justification which the Constitution requires. When such conduct is identified, it must be condemned by the judiciary and its fruits must be excluded from evidence in criminal trials.

392 U.S. at 15, 88 S.Ct. at 1876.

Accordingly, I would reverse Salas' conviction and remand for reevaluation of his suppression motion absent consideration of the cocaine illegally seized from his person.

---

Nendel's Motel only one day prior to the arrest of Salas and Munoz, none of the officers involved in this investigation had any previous contact with, or knowledge of, their alleged narcotics activities.