52 F.3d 335
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Camerina TAPIA-TORRES, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Lucio BETANCOURT, Defendant-Appellant.
 Nos. 94-10134, 94-10152.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Feb. 13, 1995.
Decided April 13, 1995.
 
 Before: BOOCHEVER, NORRIS, and HALL, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Camerina Tapia-Torres and Lucio Betancourt were convicted of conspiracy to manufacture and distribute methamphetamine in violation of 21 U.S.C. Secs. 841(a)(1) and 846. They raise numerous challenges to their convictions on appeal. We affirm.
 
 DISCUSSION
 
 3
 I. The District Court Did Not Err in Denying the Defendants' Rule 29 Motion for Acquittal
 
 
 4
 Tapia-Torres and Betancourt argue that the district court should have granted their Rule 29 motion for acquittal because there was insufficient evidence to support their convictions.
 
 
 5
 In considering a challenge to the sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See United States v. Shirley, 884 F.2d 1130, 1134 (9th Cir.1989). We draw all reasonable inferences from the evidence in favor of the government, United States v. Federico, 658 F.2d 1337, 1343 (9th Cir.1981), and we assume that the jury resolved all matters in a manner which supports the verdict. United States v. Garza, 980 F.2d 546, 552 (9th Cir.1992).
 
 
 6
 The superseding indictment here charged all the defendants with participation in a single conspiracy. The government therefore was required to show that some form of overall agreement existed. See United States v. Kenny, 645 F.2d 1323, 1335 (9th Cir.), cert. denied, 452 U.S. 920 (1981). The agreement did not need to be formal or explicit; it could be inferred from the defendants' acts or other circumstantial evidence. Id. Once the existence of the conspiracy had been shown, the government needed only to prove the defendants' "slight" connection with the conspiracy beyond a reasonable doubt to convict them of knowing participation in the conspiracy. See Garza, 980 F.2d at 552.
 
 
 7
 We find that the evidence was sufficient to establish the existence of a single conspiracy and the defendants' connection to it. On June 17, 1992, Tapia-Torres delivered half a pound of methamphetamine for Raul Amescua to confidential informant Fermin Garcia. Testimony at trial suggested that the purity level of the half-pound of methamphetamine matched that of the methamphetamine found at the Selma lab.
 
 
 8
 In August, 1992, Garcia was instructed by Raul and Gonzalo Amescua to contact Tapia-Torres about buying vacuum pumps. During Garcia's tape-recorded conversation with Gonzalo Amescua, Garcia asked Gonzalo whether Tapia-Torres knew about the vacuum pumps, and Gonzalo twice responded, "She knows everything." Under police surveillance, Garcia then met with Tapia-Torres to get the money to buy the pumps, and he delivered them to her after they were purchased. The pumps were later found in their original boxes in a trailer on co-defendant Betancourt's property.
 
 
 9
 On December 1, Raul Amescua told confidential informant Lori Martinez that he rented rooms at the Lampliter Inn for his workers. Martinez testified that on January 19, 1993, Amescua instructed her to take two pounds of red powder to his house and that Betancourt took the red powder from her. She overheard Betancourt mention that he was "going to light the fire" which indicated that he was going to heat up the chemicals to start the reaction process. Two days later, police observed methamphetamine manufacturing activities at the Woodlake lab site.
 
 
 10
 During the time of the methamphetamine manufacturing in January, Tapia-Torres rented two rooms at the Lampliter Inn and was staying in one of them with Raul Amescua on the night she was arrested. At the time of her arrest, she admitted ownership of the cellular phone and pagers found in the room. Phone records indicated that during the time alleged in the indictment, the phone at the Selma lab site called these pagers 32 times and the phone at the Woodlake lab site called them 3 times. The records also indicated that 35 calls to the Selma lab site and 2 calls to the Woodlake lab site were made from Tapia-Torres' cellular phone. This phone also called the Betancourt residence 36 times.
 
 
 11
 When Lucio Betancourt was arrested in his van, he and eight other men were leaving the Woodlake lab site. Police found a pound of methamphetamine in the van, a gram scale, eight flashlights, and a cellular phone with Tapia-Torres' phone numbers programmed into the speed dial. There were also two pieces of paper with Tapia-Torres' name and phone numbers, with the instructions "call collect," written on them. The shoes of eight of the nine men, including Betancourt, contained methamphetamine residue. At the lab site, officers found 20 pounds of methamphetamine and Betancourt's fingerprints on two condensers.
 
 
 12
 Subsequent searches of the residences of Tapia-Torres, Amescua, and Betancourt, produced large amounts of cash and a number of semi-automatic weapons and assault rifles.
 
 
 13
 Viewed in the light most favorable to the government, the evidence indicated that a single, overall conspiracy existed and that Tapia-Torres and Betancourt had at least a "slight" connection to it.
 
 
 14
 Tapia-Torres argues that there was no evidence that she had ever been at the Woodlake site, that she had ever met Betancourt, or that she had supplied any of the equipment or chemicals used at that site. She contends that the fact that her boyfriend Raul Amescua may have been involved in such an enterprise did not constitute proof of her knowledge. Betancourt also argues that there was no evidence that he had ever met with Amescua or Tapia-Torres, or that he had supplied any of the equipment used at the lab site. He argues that when he was arrested he was simply going to pick up farm workers at the Woodlake site.
 
 
 15
 In support of their arguments, the defendants cite United States v. Cloughessy, 572 F.2d 190 (9th Cir.1977) and United States v. Penagos, 823 F.2d 346 (9th Cir.1987), in which the evidence was insufficient to sustain a conspiracy conviction. In both cases, however, the defendants were merely present when drug transactions took place, and the court found that "mere proximity to the scene of illicit activity" or "mere casual association with conspiring people," without more, was insufficient to establish knowing participation in a conspiracy. Penagos, 823 F.2d at 348; Cloughessy, 572 F.2d at 191.
 
 
 16
 In the instant case, the evidence indicates that the defendants did more than simply casually associate with people who may have been involved in drug transactions. Each defendant was directly involved in at least part of the drug activities. "A single conspiracy may involve several subagreements or subgroups of conspirators." United States v. Bibbero, 749 F.2d 581, 587 (9th Cir.1984), cert. denied, 471 U.S. 1103 (1985). This is what was involved here. The defendants were each involved in various activities that were linked in an overall enterprise of drug manufacture and distribution. The fact that Tapia-Torres and Betancourt may not have directly met with each other during the relevant time period is not dispositive. See Garza, 980 F.2d at 553 (evidence sufficient to support conspiracy conviction although defendant never met personally with other co-defendant or undercover agent).
 
 
 17
 II. The District Court Did Not Err in Denying Tapia-Torres' Pretrial Motion to Suppress Evidence Seized from Her Home, Her Business, and the Motel Room in which She Was Arrested
 
 A. January 21 Warrantless Arrest
 
 18
 Tapia-Torres argues that there was no probable cause to arrest her, and that therefore, statements she made after the arrest admitting ownership of the cellular phone and pagers found in the motel room should have been suppressed.
 
 
 19
 "A warrantless arrest is valid if it is supported by probable cause." United States v. Hoyos, 892 F.2d 1387, 1392 (9th Cir.1989), cert. denied, 498 U.S. 825 (1990). Probable cause exists when the facts and circumstances within the officers' knowledge are sufficient to warrant a prudent person to believe that a suspect has committed, is committing, or is about to commit a crime. United States v. Thomas, 835 F.2d 219, 222 (9th Cir.1987), cert. denied, 486 U.S. 1010 (1988). Determination of probable cause is a mixed question of law and fact which is reviewed de novo. Hoyos, 892 F.2d at 1392. However, the reviewing court must accept the underlying facts as found by the district court unless clearly erroneous. Id.
 
 
 20
 The government maintains that State Bureau of Narcotics Enforcement ("BNE") Agent, Moses Rodriguez, arrested Tapia-Torres, and that before the arrest he knew from informant Garcia and from surveillance records that Tapia-Torres had delivered half a pound of methamphetamine to Garcia and had purchased two vacuum pumps through Garcia. Tapia-Torres contends that Agent Rodriguez was not the arresting officer and that probable cause can only be based on the knowledge possessed by the arresting officer or by other officers actually assisting or participating in the arrest.
 
 
 21
 The arresting officer need not have personal knowledge of the facts indicating probable cause to support a warrantless arrest. See United States v. Bertrand, 926 F.2d 838, 844 (9th Cir.1991). "Probable cause may be based on the collective knowledge of all of the officers involved in the investigation and all of the reasonable inferences that may be drawn therefrom." Hoyos, 892 F.2d at 1392. At the hearing on Tapia-Torres' motion to suppress, the government stated that Agent Rodriguez was present during the arrest and that the investigation involved a "combined task force" with state narcotics agents and local police. Therefore, probable cause could be supported by the collective knowledge of all the agents, including Agent Rodriguez, who were involved in the surveillance operation and investigation.
 
 
 22
 Tapia-Torres nonetheless argues that there was no evidence that before her arrest Agent Rodriguez actually knew about Tapia-Torres' involvement in the purchase of the half-pound of methamphetamine and the vacuum pumps. The district court found, however, that he did know of those two incidents prior to her arrest but did not present the information to the issuing magistrate until after the arrest because he had been instructed not to do anything to reveal the identity of the informant Garcia at that time. Tapia-Torres does not argue that this factual finding was clearly erroneous. Therefore, Agent Rodriguez did have probable cause to arrest her. See United States v. Salas, 879 F.2d 530, 536 (9th Cir.) (Informants' statements about observing drugs in motel room and officers' observations of defendants on apparent narcotics delivery gave probable cause to arrest defendant in motel room), cert. denied, 493 U.S. 979 (1989). Moreover, because this was a joint investigation, there were other officers who were aware of the two incidents, and probable cause could be based on their collective knowledge.
 
 
 23
 Accordingly, the district court correctly found that probable cause existed to support Tapia-Torres' warrantless arrest.
 
 B. January 21 Warrant Search of Motel Rooms
 
 24
 Tapia-Torres argues that the district court should have suppressed evidence seized as a result of the search of her motel rooms at the Lampliter Inn because the search warrant was not supported by probable cause.
 
 
 25
 "A magistrate's determination of probable cause to issue a warrant is treated with great deference and is not ... reverse[d] ... unless it is clearly erroneous." United States v. McQuisten, 795 F.2d 858, 861 (9th Cir.1986). The reviewing court must decide whether under the totality of the circumstances the magistrate had "a substantial basis for concluding that the affidavit in support of the warrant established probable cause." United States v. Ayers, 924 F.2d 1468, 1478 (9th Cir.1991) (citations omitted).
 
 
 26
 Police submitted a 25-page affidavit in support of the search warrant which detailed a series of observations made by the affiant, the two confidential informants, and other BNE agents and local police officers.[1]
 
 
 27
 Tapia-Torres argues that the information was insufficient to constitute probable cause because Amescua had stated that "he" rented rooms for his workers at the Lampliter Inn but the rooms searched were rented by Tapia-Torres. Tapia-Torres maintains that if Amescua had rented the rooms, probable cause may have existed to search them based on the information in the supporting affidavit. The district court found that even though Amescua was not the registered guest of the rooms, his coming and going from the rooms during a time when police observed drug manufacturing activities, coupled with the information that his workers stayed at the Inn, constituted probable cause to search the rooms.
 
 
 28
 Tapia-Torres also argues that the warrant was based upon stale information, i.e., Amescua's December 1 statement, made six weeks before the search, that he rented rooms for his workers at the Inn. According to Tapia-Torres, the statement did not indicate when he last rented rooms at the Inn. The district court found that the information was not stale in light of the ongoing nature of the enterprise and police corroboration of Amescua's continued presence at the Inn.
 
 
 29
 The district court's findings were proper. Probable cause to search may be established by converging details in an affidavit which form a fair probability that evidence of criminal activity will be found. See United States v. Potter, 830 F.2d 1049, 1052 (9th Cir.1987), cert. denied, 485 U.S. 937 (1988); United States v. Kinstler, 812 F.2d 522, 525 (9th Cir.1987). The details set out in the affidavit formed a pattern in which Amescua repeatedly entered the motel rooms during periods of observed methamphetamine production. The personal observations of the officers and their corroboration of the informants' information were sufficient to constitute probable cause to search those rooms whether they were technically registered in the name of Amescua or Tapia-Torres.
 
 
 30
 Furthermore, the lapse of time between Amescua's December 1 statement to the informant and the actual search was not sufficiently significant to render the information stale. Staleness arguments lose much of their force when there is evidence of a firmly entrenched, ongoing narcotics operation. See United States v. Hernandez-Escarsega, 886 F.2d 1560, 1566 (9th Cir.1989) (information of events occurring 20 months before search was not too stale to establish probable cause in light of evidence of widespread, continuous drug enterprise), cert. denied, 497 U.S. 1003 (1990); United States v. Dozier, 844 F.2d 701, 707 (9th Cir.), cert. denied, 488 U.S. 927 (1988).
 
 
 31
 Therefore, we find that the magistrate had probable cause to issue the search warrant for the rooms.
 
 
 32
 C. January 28 Warrant Searches of Home and Business
 
 
 33
 One week after Tapia-Torres' arrest, police searched her home and business. Tapia-Torres argues that the search warrant lacked probable cause.
 
 
 34
 At the time the warrant was executed, Tapia-Torres had already been arrested, along with fourteen others, a week earlier in connection with the production and sale of methamphetamine, and incriminating evidence had been seized during the arrests. We have held that "[i]n the case of drug dealers, evidence is likely to be found where the dealers live. When the traffickers consist of a ringleader and assistants, a fair probability exists that drugs will be present at the assistants' residence as well as the ringleader's." United States v. Angulo-Lopez, 791 F.2d 1394, 1399 (9th Cir.1986) (citations omitted). Even if Tapia-Torres could only be considered an assistant of Amescua, for whom there was a great deal of evidence of methamphetamine manufacture and distribution, there was a fair probability under Angulo-Lopez that evidence would be found at Tapia-Torres' home and business to support the issuance of the warrant. This court has held that "[i]n doubtful cases, preference should be given to the validity of the warrant." United States v. McQuisten, 795 F.2d 858, 861 (9th Cir.1986).
 
 
 35
 Tapia-Torres argues that a Franks hearing was warranted because the affiant knowingly distorted the facts when he stated:
 
 
 36
 .. [S]earch warrants were served on 1/21/93 in which 15 defendants were arrested and over 22 pounds of Methamphetamine were recovered. In those arrested was a Camerina Torrez Tapia [sic]....
 
 
 37
 Tapia-Torres contends that the affiant's failure to advise the magistrate that she was arrested in a different city from where the drug labs were located and where the drugs were seized constituted a deliberate, or reckless disregard for the truth, which required a Franks hearing. See Franks v. Delaware, 438 U.S. 154, 155-56 (1978).
 
 
 38
 The district court found that a Franks hearing was not warranted because Tapia-Torres presented no evidence that the statements were knowingly false or made with reckless disregard for the truth. Furthermore, the statements were not necessary to a finding of probable cause. The affidavit contained other information that was corroborated by police, and there was a statement indicating that Tapia-Torres was "one of the largest distributors of methamphetamine" in the county. Moreover, the same magistrate issued all the warrants for the searches, and thus was familiar with the fact that the motel where Tapia-Torres was arrested was located in Visalia and not in Woodlake where the drug lab was located.
 
 
 39
 The district court was correct in its determination that a Franks hearing was not required. Under the circumstances, the failure to note the different locations did not amount to a distortion that would have seriously misled or altered the magistrate's finding of probable cause.
 
 
 40
 In conclusion, the district court's denial of Tapia-Torres' motion to suppress evidence was proper.
 
 
 41
 III. The District Court Did Not Err in Basing Tapia-Torres' Sentence on the Entire Amount of Contraband Involved and in Refusing to Reduce Her Sentence Based on Her Claim of Being a Minor Participant in the Conspiracy
 
 
 42
 The district court based Tapia-Torres' sentence on the entire amount of methamphetamine seized during the investigation. Tapia-Torres argues that the evidence at best established that she was involved only in the June 17 half-pound delivery, and that thus, her sentence should have been based solely on that amount.
 
 
 43
 A district court's findings about the quantity of drugs on which a sentence should be based are factual findings which are reviewed for clear error. United States v. Mitchell, 964 F.2d 454, 457 (5th Cir.1992). The court is not limited to considering the amount of drugs seized or specified in the indictment, but may consider amounts that were part of a common plan or scheme to distribute. Id. at 458. Because this is a conspiracy case, Tapia-Torres is to be sentenced "on the basis of the quantity of drugs which [she] reasonably foresaw or which fell within 'the scope' of [her] particular agreement with the conspirators." United States v. Petty, 992 F.2d 887, 890 (9th Cir.1993).
 
 
 44
 During the sentencing hearing, Tapia-Torres argued that she had no connection to the drugs found at the Selma and Woodlake labs. The district court disagreed, however, finding that the entire amount of drugs was foreseeable to her. Testimony at trial indicated that the purity level of the half-pound of methamphetamine involved in the June 17 delivery matched that of the methamphetamine found at the Selma lab. During the time of the drug manufacturing activities at the Woodlake lab, Tapia-Torres had rented two rooms at the Lampliter, and phone records reflected calls between her phones, the lab, and some of the men, including Betancourt, who were arrested leaving the lab with methamphetamine. The district court found that the evidence as a whole indicated that she was significantly involved in the entire conspiracy and was therefore responsible for the entire amount of drugs seized.
 
 
 45
 The district court's findings were not clearly erroneous given the evidence as a whole. There was evidence indicating that both labs were part of a common plan or scheme to manufacture and distribute methamphetamine, with Raul and Gonzalo Amescua as the leaders. Therefore, we cannot conclude that the court clearly erred in basing Tapia-Torres' sentence on the entire amount of drugs involved. See United States v. Lillard, 929 F.2d 500, 504 (9th Cir.1991) (not clear error for court to add drug quantities from second drug lab where court implicitly concluded that both labs were part of a general scheme to manufacture).
 
 
 46
 Tapia-Torres, however, argued that, even if the entire amount of drugs was foreseeable to her, she was merely a "minimal" or "minor" participant in the conspiracy and therefore should have been granted a downward adjustment in her sentence. The district court denied the reduction.
 
 
 47
 The Guidelines provide for a 2-4 level reduction when a defendant is "plainly among the least culpable of those involved in the conduct of a group," or "is less culpable than most other participants, but whose role could not be described as minimal." U.S.S.G Sec. 3B1.2, comment. (nn. 1, 3). A district court's denial of minor or minimal participant status will be upheld unless clearly erroneous. United States v. Ocampo, 937 F.2d 485, 491 (9th Cir.1991). "A simple statement by the district court that the defendant was not a minor participant is typically sufficient to settle the question." Id.
 
 
 48
 The district court expressly found that Tapia-Torres was "one of the major players" in the conspiracy because Gonzalo Amescua indicated that she "knew everything" that was going on, she had arranged for the vacuum pump purchases, and she was in extensive phone contact with the labs and the men who were arrested leaving the lab. The court was convinced that there was enough evidence to "tie her into the larger conspiracy." Id.
 
 
 49
 Tapia-Torres does not explain how the court's finding was clearly erroneous other than to state that her "involvement was minimal when compared to that of the other codefendants." However, the mere fact that "one participant's activity may be less culpable than one's co-participants does not require a finding of minor participant status." United States v. Peters, 962 F.2d 1410, 1415 n. 1 (9th Cir.1992).
 
 
 50
 Therefore, we find that the district court's refusal to reduce Tapia-Torres' sentence as a minor or minimal participant was not clearly erroneous.
 
 
 51
 IV. The Government Did Not Commit Prosecutorial Misconduct During the Trial by:
 
 
 52
 A. Using Statements from a Juvenile Probation Report to Impeach a Defense Witness' Testimony
 
 
 53
 The defense called Isidro Lopez, a juvenile, to testify on Betancourt's behalf. Lopez was one of the men arrested in the van with Betancourt leaving the Woodlake lab site. Lopez testified that he went to Woodlake to pick fruit before school. The government on cross-examination attempted to impeach Lopez's testimony by raising prior inconsistent statements he made to his probation officer indicating that he moved several buckets for Betancourt while at Woodlake and observed several men packaging some unknown substance into bags. On cross-examination, Lopez affirmed that he had made those statements to his probation officer.
 
 
 54
 Betancourt argues that the government was not entitled to refer to the statements in the probation report because juvenile probation reports are sealed documents and "may be inspected only by court personnel, the district attorney ... the minor who is the subject of the proceeding, his or her parents ... and any other person who may be designated by court order of the judge of the juvenile court...." Cal.Welf. & Inst.Code Sec. 827 (West Supp.1995). Because there was no court order, Betancourt contends that the government illegally obtained and used the probation report to impeach Lopez's testimony.
 
 
 55
 The purpose of the California statute, however, is to protect the confidentiality of juvenile delinquents. Betancourt has no standing to assert Lopez's confidentiality privilege in this matter, and Lopez, by testifying on behalf of Betancourt, publicly disclosed his involvement in the events leading to his arrest, thereby waiving his right to confidentiality. We agree with the government that the state's interest in protecting the confidentiality of juvenile probation reports does not give juvenile witnesses license to commit perjury in federal court and be exempt from impeachment attempts.
 
 
 56
 The Supreme Court has specifically stated that a "[s]tate's policy interest in protecting the confidentiality of a juvenile offender's record cannot require yielding of so vital a constitutional right as the effective cross-examination ... of an adverse witness." Davis v. Alaska, 415 U.S. 308, 320 (1974) (holding that refusal to allow defendant to impeach prosecution witness by showing his probation status as juvenile delinquent violated defendant's right to cross-examine witnesses, notwithstanding state policy and statute protecting confidentiality of juvenile offenders). Davis indicates that state laws protecting the confidentiality of juvenile delinquents are not absolute and, under certain circumstances, may be subordinated to other interests. Therefore, in this case, we find that the government did not commit prosecutorial misconduct by using prior inconsistent statements in the probation report to impeach Lopez's testimony.
 
 
 57
 Even if we were to find that the government's use of the probation report was error, it was harmless. There was other substantial evidence linking Betancourt to the methamphetamine manufacturing activities at the Woodlake lab. See supra part I.
 
 
 58
 B. Referring to Betancourt As Having Been Arrested "in the lab"
 
 
 59
 During the cross-examination of one of Betancourt's character witnesses, the government asked the witness if his opinion of Betancourt's truth and veracity would change if he assumed Betancourt had been "arrested in this lab site" or "in the lab." Betancourt argues that these references were improper. The government maintains that it was free to argue reasonable inferences from the evidence and that the evidence indicated that Betancourt was in the lab at some point.
 
 
 60
 Even assuming the government's references were improper, the error was harmless in light of the other substantial evidence connecting Betancourt to the lab activities. See supra part I.
 
 
 61
 V. The District Court Did Not Err in Denying Betancourt's Motion to Sever the Trial
 
 
 62
 Betancourt filed a motion for severance which was denied by the district court. He failed, however, to renew the motion at the close of the evidence. "[T]o preserve the issue on appeal, a motion to sever must be renewed at the close of the evidence or it is waived." United States v. Burgess, 791 F.2d 676, 678 (9th Cir.1986). Therefore, Betancourt is precluded from raising on appeal the issue of whether he was entitled to severance.
 
 
 63
 VI. The District Court Did Not Err in Allowing Gonzalo Amescua's Statements into Evidence As Co-conspirator's Statements and in Allowing Evidence of the Selma Lab Site
 
 
 64
 Tapia-Torres argues that the district court improperly allowed into evidence taped conversations between Gonzalo Amescua and Garcia in which Gonzalo instructed Garcia to call Tapia-Torres about purchasing the vacuum pumps and stated a number of times that she "knows everything." Tapia-Torres maintains that these statements were inadmissible hearsay. She also argues that the court erred in admitting evidence of the Selma lab site because there was no indication that the Selma lab was within the scope of the charged conspiracy.
 
 
 65
 Hearsay statements are admissible if made by a co-conspirator during and in furtherance of the conspiracy. Fed.R.Evid. 801(d)(2)(E). The government must show by a preponderence of the evidence that the hearsay declarant is a co-conspirator. See Bourjaily v. United States, 483 U.S. 171, 177 (1987). The determination that a conspiracy existed and that the statements were made in furtherance of it is reviewed for clear error, and the decision to admit co-conspirator statements is reviewed for an abuse of discretion. See United States v. Arambula-Ruiz, 987 F.2d 599, 607 (9th Cir.1993).
 
 
 66
 The district court did not abuse its discretion in admitting Gonzalo's statements. There was evidence indicating that Gonzalo was involved in the conspiracy. His fingerprints were found at the Selma lab site. He told Garcia that he and Raul Amescua were working together, and he instructed Garcia to call Raul or Tapia-Torres about purchasing the vacuum pumps. His statements with respect to Tapia-Torres and his instructions to contact her were therefore made in furtherance of the conspiracy.
 
 
 67
 With respect to the Selma lab site evidence, the district court did not err in allowing it as well. Phone records indicated that numerous calls were made between the Selma lab and Tapia-Torres' phones during the time specified in the indictment. Gonzalo's fingerprints were found there. The methamphetamine in the June 17 half-pound delivery had the same purity level as that of methamphetamine seized from the Selma lab, which led to the inference that it had been manufactured there. In light of these connections to the Selma lab site, we find that the allowance of the evidence was not improper.
 
 
 68
 VII. The District Court Did Not Err in Denying the Defendants' Requests to Strike Identification Testimony Given by the Informants and to Conduct a Live Line-up, Because of Allegedly Improper Pretrial Photographic Identifications by the Informants
 
 
 69
 The defendants argue that the informants' in-court identification testimony should have been stricken or a live line-up performed because the government conducted an improperly suggestive pretrial photographic identification session with the informants. The informants Garcia and Martinez were shown a photo album with about 50 photographs and were asked whether they recognized anyone. The informants identified Tapia-Torres and Betancourt. The photos included blown-up driver's license pictures of the defendants with their names on the backs. There were no written reports or tape recordings made of the sessions, and the photo albums were not preserved in the same order later.
 
 
 70
 The government maintains that the purpose of the photographic showing was not for the informants to identify the defendants, but to see if they recognized anyone other than the defendants who was involved in the conspiracy. Police already assumed that Garcia and Martinez knew Tapia-Torres and Betancourt because of their face-to-face encounters with them in the past.
 
 
 71
 Even if an out-of-court identification procedure is impermissibly suggestive, identification testimony may nonetheless be sufficiently reliable to be admitted into evidence, United States v. Nash, 946 F.2d 679, 681 (9th Cir.1991), if for example, the witness has had an opportunity to view the criminal at the time of the crime. United States v. Simoy, 998 F.2d 751, 752 (9th Cir.1993). Assuming, without deciding, that the photographic identification procedures in the instant case were improperly suggestive, we find that the informants' identification testimony was sufficiently reliable. The evidence suggested that Garcia had an opportunity to observe Tapia-Torres on at least two occasions, during the June 17 half-pound delivery and the August vacuum pump purchase, and Martinez had observed Betancourt when she delivered the red powder to him. Thus, the district court did not err in refusing to strike the in-court identification or conduct a live line-up. See United States v. Hernandez-Valenzuela, 932 F.2d 803, 804 (9th Cir.1991) (inspector's in-court identification of defendant was sufficiently reliable, notwithstanding inspector's accidental pretrial view of defendant's identification card, when identification was based on inspector's opportunity to observe defendant at the scene).[2]
 
 CONCLUSION
 
 72
 For the reasons set forth above, we AFFIRM the judgment of the district court.
 
 
 73
 AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 The information in the affidavit included the following: Beginning in July, 1992, police began investigating defendant Raul Amescua. Over the next seven months, police obtained evidence that he was engaged in the manufacture of methamphetamine. They observed and recorded a number of activities and conversations Amescua had with informants regarding drug production and sales
 On December 1, 1992, Amescua told a confidential informant that he rented four or five rooms at the Lampliter Inn in Visalia to house people who worked for him making methamphetamine. On January 8, 1993, Amescua told the informant that a production of methamphetamine was not yet completed but might be finished the next day. On January 9, officers observed Amescua briefly enter two rooms at the Lampliter Inn. Later that day, Amescua gave the informant two large packages wrapped in foil and instructed him to deliver them to two individuals at a different location.
 On January 19, Amescua entered room 259 at the Lampliter Inn with at least two other people. The next day, officers observed activity at the Woodlake lab site consistent with the manufacture of methamphetamine. They also saw Amescua again enter room 259 and another room at the Lampliter. Rooms 259 and 263 were registered to Tapia-Torres at the time.
 
 
 [2]
 Tapia-Torres and Betancourt also raise the argument that the government committed Jencks Act and Brady violations by not producing the informants' identities before trial and by failing to inform the defense before trial of the prior photographic identification session. There is little merit to these arguments, and we find that the district court did not abuse its discretion in finding that no violations had been committed
 The government was not required to reveal the informants' identities before trial. See United States v. Wong, 886 F.2d 252, 255-56 (9th Cir.1989) (government has limited privilege to withhold identity of confidential informant; defendant has burden of showing need for disclosure of identity; mere suspicion that information will prove helpful is insufficient). The Jencks Act requires only that a witness' statement be subject to discovery after the witness has testified on direct examination. See United States v. Barker, 988 F.2d 77, 79 (9th Cir.1993). Thus, the government did not have to produce the informants' statements until after they had testified at trial. Moreover, Brady merely requires the government to disclose evidence that is "favorable to an accused ... where the evidence is material either to guilt or to punishment." Brady v. Maryland, 373 U.S. 83, 87 (1963). The informants' positive identification of the defendants is not the type of "favorable" evidence that must be disclosed as contemplated by Brady. See Barker, 988 F.2d at 78 (no duty under Brady to inform defendant that witness who earlier failed to pick defendant out of lineup later identified defendant as perpetrator because that evidence is not "favorable to an accused").