UNITED STATES of America,
Plaintiff–Appellee,

v.

Hector Hernan HOYOS,
Defendant–Appellant.

No. 87–5060.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 1, 1988.

Decided March 6, 1989.

As Amended on Denial of Rehearing and Rehearing En Banc Dec. 20, 1989.

Michael D. Abzug, Los Angeles, Cal., for defendant-appellant.

James L. McGinnis, Los Angeles, Cal., for plaintiff-appellee.

Before WALLACE, ALARCON and BEEZER, Circuit Judges.

ALARCON, Circuit Judge:

Hector Hernan Hoyos (Hoyos) appeals from the judgment of conviction for conspiracy to possess cocaine with the intent to distribute in violation of 21 U.S.C. § 841(a)(1) (1982). After the denial of his suppression motions, Hoyos entered a plea of guilty conditioned upon his right to appeal the adverse rulings. Subsequently, he filed a motion to withdraw his guilty plea. This motion was also denied.

Hoyos seeks reversal on the following grounds:

(1) He was arrested without probable cause.

(2) The protective sweep of his residence was an unreasonable search.

(3) The district court erred in concluding that probable cause supported the issuance of a search warrant.

(4) The district court abused its discretion in denying his motion to withdraw his guilty plea.

We affirm because we have concluded that each of these contentions is without merit. We address each issue and the facts pertinent thereto under separate headings.

## I.

### EXISTENCE OF PROBABLE CAUSE TO ARREST HOYOS

On September 12, 1986, Los Angeles County Deputy Sheriff Thomas Mulligan,[1] received an anonymous telephone call that informed him that persons living at 356 Eagle Nest, Diamond Bar, California, were dealing in narcotics. The residents did not appear to be employed. Periodically, strangers in new cars would arrive at the residence and stay for short periods of time. Deputy Mulligan was also informed that the Glendale Police Department was at that location approximately five months earlier.

Deputy Mulligan contacted a narcotics investigator at the Glendale Police Department. He was informed that the Glendale Police Department had received information that 356 Eagle Nest was a safe house for storing large amounts of cocaine. The Glendale investigators abandoned their investigation after observing that the Eagle Nest house appeared to be empty and unused.

On the same date, Deputy Mulligan contacted United States Customs, Special Agent Ronald L. Ingleby [2] and advised him of the information he had obtained concerning the Eagle Nest location. On September 19, 1986, Special Agent Ingleby observed two men and a woman remove one dozen full, heavy, gray plastic bags from a silver colored Buick automobile and take them into the residence at 356 Eagle Nest.

On September 22, 1986, Deputy Mulligan was assigned to conduct a surveillance of the residence located at 356 Eagle Nest. At 9:30 a.m., Deputy Mulligan observed Misael Pulgarin leave the residence. Deputy Mulligan followed him to a Denny's Restaurant in the City of Brea.

En route, Deputy Mulligan observed Pulgarin drive slowly, then rapidly increase his speed, make U-turns in the middle of streets, slow down at green lights, and then accelerate through intersections when the lights turned yellow. Deputy Mulligan noted that Pulgarin intermittently used a cellular telephone in the car. Deputy Mulligan stated in his affidavit that "[b]ased upon more than 50 previous occasions of surveillance of narcotics traffickers, [he] recognized this behavior as counter-surveillance driving; that is, an attempt to detect law enforcement surveillance."

At the restaurant, Pulgarin met Thomas Cuellar. After 15 to 20 minutes, they left in a blue Mazda 626.

On September 23, Deputy Mulligan resumed surveillance of the Eagle Nest residence at 8:00 a.m. Pulgarin left the residence at 8:45 a.m. in a brown Nissan Sentra and drove to Hunny's Restaurant.

Deputy Mulligan observed Pulgarin stop twice to make telephone calls. Each time Pulgarin dialed two sets of numbers and then received a return telephone call. Deputy Mulligan stated in his affidavit in support of the search warrant that it is a common practice among drug traffickers to communicate through the use of a "beeper." These telephone calls were referred to by Deputy Mulligan as "beeper calls." At Hunny's, Pulgarin met Hoyos, who had arrived there in a white Mazda 626. The two men left the restaurant and drove their respective cars to 15603 Starbuck Avenue in Whittier.

---

**1.** Deputy Mulligan has been assigned to narcotics investigations for three years. He has taken part in several hundred investigations.

**2.** Special Agent Ingleby is assigned to investigate violations of United States currency and narcotics laws. Prior to this case, he had been involved in approximately 50 narcotics investigations.

On September 24, 1986, Deputy Mulligan began surveillance of the Starbuck residence. At 2:00 p.m., he observed Hoyos drive away in the white Mazda. Deputy Mulligan observed Hoyos drive to a public telephone. He did not travel a direct route on through streets. Instead, Hoyos used residential streets and drove through a school zone. Deputy Mulligan testified that Hoyos did not use the route that "based upon eleven years of familiarity with the area, would have been most direct." Deputy Mulligan further testified that, based on his experience as a narcotics investigator Hoyos "did so in an effort to detect surveillance."

At the public telephone, Deputy Mulligan observed Hoyos make two "beeper" calls. Hoyos then pulled behind a building and stayed for twenty to twenty-five minutes. After that he drove to a Del Taco and made one or two more beeper calls.

At 8:50 a.m., on September 25, 1986, Deputy Mulligan returned to the Eagle Nest residence to resume his surveillance. He observed Pulgarin leave at 9:45 a.m. in a gray Plymouth Reliant.

Sergeant Thomas Stover,[3] of the Los Angeles Sheriff's Office followed Pulgarin to the Denny's Restaurant in Brea. Pulgarin made several telephone calls from public telephones en route. He arrived at Denny's at approximately 10 a.m. Pulgarin waited in a booth for 15 to 20 minutes at which time Cuellar joined him. They remained in the restaurant for 30 minutes.

Pulgarin and Cuellar left the restaurant together and drove to a Sears store in La Habra. Special Agent Ingleby joined the surveillance at the Sears store.

Sergeant Stover and Special Agent Ingleby followed Pulgarin and Cuellar to the parking lot at the Denny's restaurant in La Habra. There, Special Agent Ingleby observed Pulgarin and Cuellar meet Hoyos and Leonardo Amaya. Amaya gave Pulgarin a key. Pulgarin used it to enter a gold Ford pick-up truck. Pulgarin drove the truck out of the restaurant parking lot. Amaya then entered the passenger side of a brown Nissan Sentra driven by Hoyos. Cuellar entered the gray Plymouth Reliant.

The gray Reliant and the brown Nissan followed the Ford pick-up truck into the parking lot of a nearby Coco's Restaurant. Amaya got out of the brown Nissan and walked over to the Ford pick-up. Pulgarin returned the key to Amaya. Amaya left Coco's parking lot in the truck.

Special Agent Ingleby followed Amaya to the parking lot of a shopping center in Diamond Bar. There he observed Pulgarin and Cuellar in the gray Reliant. They pulled in behind Amaya. Both vehicles were then driven to the vicinity of the Eagle Nest Residence.

Early that afternoon, Deputy Mulligan observed the gray Reliant and the gold Ford pick-up at the Eagle Nest residence. The pick-up was parked in the middle of the garage. Three-quarters of the truck was inside the garage. The officers observed five persons in the garage, including Pulgarin, Amaya, and Cuellar. Shortly thereafter, Amaya drove away in the Ford pick-up truck.

Sergeant Stover followed Amaya into a K–Mart parking lot. Amaya left the truck and walked towards a McDonald's restaurant. While Sergeant Stover was still in his car he made eye contact with Amaya. Amaya increased his speed. Sergeant Stover left his car and followed Amaya into the restaurant but lost sight of him. Sergeant Stover again observed Amaya about five minutes later outside an Exxon service station, standing near a public telephone. Sergeant Stover arrested Amaya and drove him back to the truck. The truck was searched. It contained over one hundred kilograms of cocaine.

After Amaya's arrest and the seizure of the cocaine, Deputy Mulligan directed Los Angeles County Deputy Sheriff Robert Schelnutt[4] to go to the Starbuck residence

---

**3.** Sergeant Stover has been a member of the Sheriff's Office for 27 years and has been assigned to narcotics investigations for nine years.

He participated in approximately 500 narcotics investigations.

**4.** Deputy Schelnutt has worked for the Los Angeles County Sheriff's Department for over 19

to secure the premises. He told Deputy Schelnutt about the seizure of 100 kilos of cocaine and informed him that based on his observation during the investigation, he expected other persons involved in the narcotics transaction to be at the residence. Deputy Mulligan also gave Deputy Schelnutt Hoyos' physical description. In addition, he informed Deputy Schelnutt that Hoyos drove a white Mazda. Deputy Schelnutt was also directed to secure the premises so that evidence would not be destroyed while a search warrant was obtained. Deputy Schelnutt was also instructed to detain, or, if necessary, arrest additional suspects.

Deputy Schelnutt proceeded to the Starbuck residence. He was accompanied by several other Los Angeles County Sheriff's deputies including Richard Love and Frank Rodella.[5] When they arrived at the residence, the officers saw the white Mazda previously described to them in the driveway. The officers then observed two women come out the front door of the residence. After these observations were communicated to Deputy Mulligan via radio transmission, he directed the officers to detain the women. After the women entered their car, Deputy Schelnutt approached them, showed them his badge, and informed them he was conducting a narcotics investigation. At that time, the other officers approached the house.

As Deputy Love approached the house, he noticed Hoyos and a woman watching him from the backyard through a fence. Deputy Love drew his gun and yelled "Sheriff's Department", "freeze", "hold it", "police", or words to that effect. Deputy Love testified that at that time he was dressed in his green sheriff's field jacket and was not more than twelve feet away from Hoyos. Both Hoyos and the woman ran to the back door of the house. Deputy Love apprehended Hoyos just as he was pulling open the screen door.

Hoyos argues that "even if all the facts known to *all* of the officers are considered" probable cause for his arrest without a warrant is lacking. We disagree.

■ A warrantless arrest is valid if it is supported by probable cause. *United States v. Hillison*, 733 F.2d 692, 697 (9th Cir.1984); *United States v. Bernard*, 607 F.2d 1257, 1265 (9th Cir.1979). Determination of the existence of probable cause is a mixed question of law and fact in which the legal issues predominate, and is therefore subject to de novo review. *United States v. Smith*, 790 F.2d 789, 791 (9th Cir.1986). However, the underlying facts as found by the district court are reviewed for clear error. *United States v. Greene*, 783 F.2d 1364, 1367 (9th Cir.), *cert. denied*, 476 U.S. 1185, 106 S.Ct. 2923, 91 L.Ed.2d 551 (1986).

■ The test for probable cause is whether the facts and circumstances within the arresting officer's knowledge are sufficient to warrant a prudent person to believe a suspect has committed, is committing, or is about to commit a crime. *Id.* The experience and expertise of the officers involved in the investigation and arrest may be considered in determining probable cause. *Hillison*, 733 F.2d at 697; *Bernard*, 607 F.2d at 1266. The arresting officer need not have personal knowledge of the facts sufficient to constitute probable cause. *Id.* at 1267. Probable cause may be based on the collective knowledge of all of the officers involved in the investigation and all of the reasonable inferences that may be drawn therefrom. *Id.*

■ The testimony found credible by the district court was sufficient to warrant a prudent person with the officers' combined experience in narcotics investigations to believe that Hoyos was a knowing participant in a conspiracy to distribute a large quantity of narcotics. Prior to Hoyos' arrest the

---

years. He has spent over seven years with the narcotics unit and has participated in several hundred narcotics investigations.

**5.** Deputy Love has worked for the Sheriff's Department since 1969. He has been with the narcotics unit since 1976 and has also participated in hundreds of narcotics investigations.

Deputy Rodella has been with the department for nine years. He had been working with the narcotics unit for nine months at the time of the arrest. He has participated in executing search warrants and securing residences over 100 times.

team of officers investigating this case had gathered many incriminating facts. Hoyos was observed driving in a manner that is typical of counter-surveillance techniques used by persons involved in large scale narcotics transactions. In addition, Hoyos made "beeper" telephone calls from public telephone booths. Narcotics dealers in Los Angeles County use beepers and public telephones in plying their illicit trade.

The officers involved in this matter had many years of experience investigating illegal narcotics transactions. Hoyos' conduct had special significance in their eyes. "Conduct which appears innocent to a lay person may have an entirely different significance to an experienced narcotics officer." *United States v. Hicks,* 752 F.2d 379, 384 (9th Cir.1985).

The evidence shows that Hoyos was present at a meeting in a restaurant parking lot with three other persons including Amaya. Amaya was arrested later that day for possession of a large quantity of cocaine. Hoyos was present when Amaya gave Pulgarin the key to the pick-up truck that later was used to transport 100 kilos of cocaine. Amaya then drove away in a car driven by Hoyos that followed the pick-up truck to a second restaurant parking lot.

A short time later, Amaya was seen with four other persons gathered around the pick-up truck inside the garage at Eagle Nest house. Later that day, Amaya drove the pick-up truck to a shopping center parking lot. There, one hundred kilos of cocaine was found in the truck. The fact that a large quantity was seized from Amaya was communicated to the officers who were directed to secure the house and to make arrests, if necessary.

Also of significance in assessing the presence of probable cause is the fact that Hoyos fled towards the house after he was told to "Freeze" by an officer wearing a green Los Angeles County Sheriff's field jacket.

■ In determining the existence of probable cause we must look to the totality of the circumstances. The fact that some of these acts, if reviewed separately, might

be consistent with innocence is immaterial. *United States v. Casimiro–Benitez,* 533 F.2d 1121, 1123 (9th Cir.) (quoting *Hernandez v. United States,* 353 F.2d 624, 628 (9th Cir.1965), *cert. denied,* 384 U.S. 1008, 86 S.Ct. 1972, 16 L.Ed.2d 1021 (1966)), *cert. denied,* 429 U.S. 926, 97 S.Ct. 329, 50 L.Ed.2d 295 (1976). We are satisfied that a prudent person would believe that Hoyos was involved in a narcotics transaction.

■ In his opening brief, Hoyos concedes that it is the law of this circuit that "the knowledge of one officer is imputable to another for purposes of probable cause." Nevertheless, Hoyos contends that this rule does not apply because Deputy Love was not instructed to arrest Hoyos, nor was he given sufficient information to constitute probable cause. We rejected the same argument in *Bernard.* There, we held that the arresting officer need not be aware of all the facts and circumstances known to the other officers participating in the arrest. 607 F.2d at 1267. We are persuaded that probable cause existed for Hoyos' arrest without a warrant.

■ Hoyos contends that even if the officers had probable cause to arrest him, the arrest violated his fourth amendment rights because the officers arrested him in a non-public place without a warrant. It is established law that a warrantless and non-consensual entry into a suspect's home to make a routine felony arrest is prohibited. *See United States v. Alvarez,* 810 F.2d 879, 881 (9th Cir.1987) (warrantless arrest of defendant in his hotel room violated fourth amendment because of defendant's reasonable expectation of privacy in his hotel room). However, a warrantless arrest of a suspect made in a "public place" does not violate the fourth amendment. *United States v. Driver,* 776 F.2d 807, 809 (9th Cir.1985).

■ In the instant matter, although Hoyos was apprehended at the back door of his home, Hoyos and a female companion were first observed by Deputy Love as they were looking over a gate on the side of Hoyos' house. When Deputy Love ob-

served Hoyos and the woman glance toward him through the holes in the decorative top of the block wall, Deputy Love identified himself as an officer from the Sheriff's Department and told them to "hold it right there." At this point Hoyos and the woman ran towards the back door of the house.

■ The Supreme Court has stated that "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967). Individuals who voluntarily look over their backyard fence or gate and expose themselves to public view of anyone on the street cannot be said to be in an area where they have a reasonable expectation of privacy. *See United States v. Santana*, 427 U.S. 38, 42, 96 S.Ct. 2406, 2409, 49 L.Ed.2d 300 (1976) (suspect in front doorway of her home "was not in an area where she had any expectation of privacy" because "[s]he was not merely visible to the public but was as exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house"); *see also United States v. Varkonyi*, 645 F.2d 453, 457–58 (5th Cir.1981) (workers in the delivery area of a fenced yard were in a public place where the gate was open and they were clearly visible through the fence, even though they attempted to hide); *cf. Driver*, 776 F.2d at 810 (suspect was arrested in a closed office area of the warehouse, used as personal quarters, which was not exposed or visible to the public; suspect therefore had a reasonable expectation of privacy). The Supreme Court has recently reiterated its holding that activities which take place in a yard and are open to public view do not involve a reasonable expectation of privacy. *See Florida v. Riley*, —— U.S. ——, 109 S.Ct. 693, 696, 102 L.Ed.2d 835 (1989) (police may make warrantless aerial observations from helicopter of activities within a greenhouse which was exposed to public view because it had a partially opened roof); *see also Dow Chemical v. United States*, 476 U.S. 227, 239, 106 S.Ct. 1819, 1827, 90 L.Ed.2d 226 (1986) ("[T]he taking of aerial photographs of an industrial plant complex from navigable airspace is not a search prohibited by the Fourth Amendment."); *California v. Ciraolo*, 476 U.S. 207, 215, 106 S.Ct. 1809, 1813, 90 L.Ed.2d 210 (1986) ("naked eye" observation from helicopter of a backyard within the curtilage of home does not constitute a Fourth Amendment search).

Moreover, this was not a situation where the officers coerced or engaged in subterfuge to get Hoyos or the others into the yard. *Cf. United States v. Johnson*, 626 F.2d 753, 757 (9th Cir.1980) (suspect opened the door of his dwelling after the agents misrepresented their identities), *aff'd on other grounds*, 457 U.S. 537, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982). Hoyos was under arrest from the time Deputy Love instructed him to stop. At that time Hoyos was looking out and over his fence exposing himself to public view of anyone on the street. Thus, Hoyos was in a "public place." *See United States v. Allen*, 675 F.2d 1373, 1382 (9th Cir.1980) (officers with probable cause to arrest defendants did not need to secure a warrant for their arrest where the arrest was made on another suspect's property but not in his home), *cert. denied*, 454 U.S. 833, 102 S.Ct. 133, 70 L.Ed.2d 112 (1981).

■ Finally, the fact that Hoyos was apprehended in his backyard at his back door does not compel the conclusion that the arrest was invalid. Deputy Love was in "hot pursuit" of Hoyos from the time Hoyos was ordered to stop at the back fence to the time he was apprehended at the back door. *See Santana*, 427 U.S. at 42–43, 96 S.Ct. at 2409–10 (officers were in "hot pursuit" where suspect retreated from porch into her home after she saw the police who had probable cause to arrest her); *Warden v. Hayden*, 387 U.S. 294, 298–99, 87 S.Ct. 1642, 1645–46, 18 L.Ed.2d 782 (1967) (police search of home justified where police were in hot pursuit of an armed robber); *United States v. Reed*, 733 F.2d 492, 504 (8th Cir.1984) (officer was in hot pursuit where suspects fled from fenced construction yard into a building

after the officer identified himself as a police officer).

## II.

### PROTECTIVE SWEEP OF THE STARBUCK RESIDENCE

■ Hoyos presents a two-fold challenge to the validity of the initial entry into his residence. First, he argues that the officers did not have an "articulable reason to believe that others would be, in fact, inside the residence." Secondly, he contends that, assuming arguendo that articulable facts existed, the protective sweep exception to the requirement of a search warrant to enter a residence is inapplicable where the arrest takes place outside.

As set forth above, Deputy Love first observed Hoyos looking at him through a fence from the backyard. Deputy Love ordered him to halt.

As Deputy Love attempted to arrest Hoyos, Deputy Rodella approached the front of the house with a second officer, Deputy Jameson. Deputy Rodella testified that he heard Deputy Love state that he had "two people coming out." According to Deputy Rodella, Deputy Love yelled at them "Sheriff's Narcotics. Freeze." Deputy Rodella also testified that he heard Deputy Love say " 'they are running back inside' and that is when myself and Deputy Jameson ran to the front door and I forced open the front door." Deputy Rodella broke the lock with a small hand-held ram. Deputy Jameson searched the left side of the house for other persons connected with the conspiracy, while Deputy Rodella covered him. Thereafter, Deputy Rodella searched the right side of the house. While clearing the house, Deputy Rodella saw an open chest in one of the rooms, filled with a large amount of money, a money counting machine, and a calculator.

Deputy Rodella testified that he had been assigned to assist in securing the Starbuck residence and apprehend any suspects. He stated that before he entered the residence he knew that a large cocaine seizure had been made and that additional suspects and evidence were expected to be found at the Starbuck residence. In his affidavit filed in opposition to the motion to suppress, Detective Rodella stated that based upon the information he had received regarding the cocaine seizure, the fact that four people had already been seen at the residence and his previous experience participating in the executions of search warrants or the securing of residences over 100 times he felt there was a need to enter the house because he believed "there were others in the house who could pose a danger" to the officers' safety or could "attempt to destroy evidence." At the hearing on the motion to suppress, Deputy Rodella testified that, in his opinion, if there are "four persons, there's possibly six, eight, or more and that could jeopardize the safety of the officers detaining these people or they could possibly destroy the evidence within the location." [6]

Deputy Love testified that based on the information he had received regarding the seizure of cocaine from the pick-up truck, Hoyos' attempt to get back inside the residence, and his previous experience in searching and securing over 500 residences, he believed there was a strong possibility there were others in the residence who would destroy evidence and pose a danger to the officers' safety. Deputy Love stated that, in his prior investigations, on at least twenty-five occasions, suspects attempted to or destroyed evidence. He also stated he had been confronted with armed suspects at least five to six times while securing a residence.

Deputy Schelnutt also testified concerning the facts that motivated the decision to

---

**6.** The dissent contends that Deputy Rodella's negative response to defense counsel's question, "[d]id you have any indication that there were other people inside?" showed that the officers "could not sustain a reasonable belief that others might be in the house—much less with a mind to destroy evidence or jeopardize the offi-

cer's safety." Dissent at p. 1402. The dissent, however, ignores the balance of that colloquy, as set forth above, in which Deputy Rodella articulated the facts which led him to believe that there might be others in the house that could pose a threat to the officers or destroy evidence.

enter the house. He stated that based on the large amount of narcotics seized in this investigation and Hoyos' conduct, he feared that evidence would be destroyed if the officers failed to enter to secure the residence. He also said he had personal knowledge of at least twenty occasions where evidence had been destroyed. Deputy Schelnutt also feared there could be others inside who could be armed and pose a danger to the officers' safety.

The district court expressly found that the government's witnesses were credible regarding their testimony in opposition to the motions to suppress. The court also found that Hoyos' testimony was not believable.

We review de novo a district court's conclusion concerning the validity of a warrantless protective sweep. *United States v. Alfonso*, 759 F.2d 728, 741 (9th Cir.1985). The underlying historical facts are reviewed under the clearly erroneous standard. *Id.*

 Officers who have effected an arrest at a residence may conduct a limited search for persons who may destroy evidence or pose a threat to the officers' safety, if the officers can point to articulable facts that support their belief that others may be on the premises. *Id.* at 742–43; *United States v. Wiga*, 662 F.2d 1325, 1330 (9th Cir.1981), *cert. denied*, 456 U.S. 918, 102 S.Ct. 1775, 72 L.Ed.2d 178 (1982).

The testimony credited by the district court establishes sufficient articulable facts that an entry into the residence was necessary to protect the officers and to avoid the destruction of evidence. During their surveillance of the Starbuck residence, the officers observed four people

leave the residence. The initial entry through the front door was not made until Deputy Rodella and Deputy Jameson heard another officer shout from the backyard that suspects were running back inside.[7] Prior to the entry, the officers reasonably believed that at least six men were involved in the distribution of cocaine. They knew that Amaya had been arrested and that a large amount of cocaine had been seized. Thus, there were at least five men including Hoyos who were not in custody. They had also observed Hoyos' white Mazda in the driveway. The officers believed that several persons who had left the residence were aware that the house was under law enforcement surveillance. In addition, any person hidden within could have heard Deputy Love's shouted commands after Hoyos ran towards the house.

The officers were also aware that over one hundred kilos of cocaine had been seized in connection with Amaya's arrest at a parking lot. It was logical for them to infer that additional cocaine would be hidden in the residences of his associates in the traffic of narcotics. In a different context, we have upheld a warrant to search a residence based on the logical assumption that "[h]eroin importers commonly have heroin and related paraphernalia where they live." *United States v. Dubrofsky*, 581 F.2d 208, 213 (9th Cir.1978). The district court was also free to consider the expert opinion of the officers that persons who distribute large quantities of narcotics are dangerous and will dispose of evidence following the arrest of a confederate.

The facts articulated by the officers justified their entry into the Starbuck residence to look for Hoyos' associates.[8] *See*

---

7. The dissent states that the fact that Hoyos was running towards the house is irrelevant. Dissent at 1402. According to the dissent, "[t]he inference from Hoyos's run for the door is that he was trying to escape, not that others were in the house." *Id.* Clearly, this is not the only possible inference that could be drawn from Hoyos's conduct. It was also reasonable for the officers to infer that Hoyos was trying to warn others inside or to escape to a place where he knew there were others who could rescue him.

8. The dissent cites *United States v. Whitten*, 706 F.2d 1000, 1016 (9th Cir.1983), as an example of a case where we held "that circumstances similar to those in this case did *not* amount to exigent circumstances." Dissent at 1402 (emphasis in original). In *Whitten*, there was no evidence that the officers had articulable facts on which to base a reasonable belief that someone other than the defendant might be present in the defendant's room. 706 F.2d at 1016. The defendant was handcuffed immediately upon arrest and there was no testimony that the officers suspected that anyone associated with the

*United States v. Castillo*, 866 F.2d 1071, 1079–81 (9th Cir.1989) (protective sweep held justified where officers had no knowledge of other persons present in apartment, but were aware that the cocaine distribution conspiracy had several members, that cocaine dealers tend to "carry guns and resort to violence," and that members of this cocaine conspiracy were willing to use violence against law enforcement officers). The fact that no one else was found in the house or that no weapons were located is not dispositive. Our review is limited to facts known to the officers *prior to* the protective sweep. We " 'must be careful not to use hindsight in limiting the ability of police officers to protect themselves as they carry out missions which routinely incorporate danger.' " *United States v. Astorga–Torres*, 682 F.2d 1331, 1335 (9th Cir.1982) (quoting *United States v. Coates*, 495 F.2d 160, 165 (D.C.Cir.1974)), *cert. denied*, 459 U.S. 1040, 103 S.Ct. 455, 74 L.Ed.2d 608 (1982) and 459 U.S. 1108, 103 S.Ct. 734, 74 L.Ed.2d 957 (1983).

Hoyos' contention that the protective sweep exception to the requirement of a search warrant to enter a residence does not apply if the arrest occurs *outside* is not supported by any authority. This is not surprising because the distinction is logically unsound. If the exigencies to support a protective sweep exist, whether the arrest occurred inside or outside the residence does not affect the reasonableness of the officer's conduct. A bullet fired at an arresting officer standing outside a window is as deadly as one that is projected from one room to another. The likelihood of the destruction of evidence is the same whether the arrest is indoors or in an outside area within the sight or hearing range of an accomplice within the residence.

In *United States v. Jackson*, 700 F.2d 181, 189 (5th Cir.) (quoting *United States v. Sheikh*, 654 F.2d 1057, 1071 (5th Cir.1981), *cert. denied*, 455 U.S. 991, 102 S.Ct. 1617, 71 L.Ed.2d 852 (1982)), *cert. denied*, 464 U.S. 842, 104 S.Ct. 139, 78 L.Ed.2d 132 (1983), the Fifth Circuit held that:

> " '[a]rresting officers have a right to conduct a quick and cursory check of the arrestee's lodging immediately subsequent to arrest—even if the arrest is near the door but outside the lodging—where they have reasonable grounds to believe that there are other persons present inside who might present a security risk.' "

▆ We agree with the Fifth Circuit that the fact that an arrest occurs outside a residence does not invalidate an otherwise lawful protective sweep.

Curiously, in his opening brief, Hoyos cites *Wiga* in support of his argument that "[t]his circuit's application of the protective sweep ... doctrine are (sic) limited to those instances where arrests are lawfully made *inside* a structure." (emphasis in original). *Wiga* supports the validity of the protective sweep in this case. In *Wiga*, the arrest was made *outside* a motor home. *Id.* at 1328. The sweep occurred after Moody, whom the officers knew had been inside of the motor home, stepped outside. We held in *Wiga* that while the "automobile exception" does not apply to the search of the inside of the motor home, *id.* at 1329, a protective sweep is proper if the officers have "a reasonable suspicion that the motor home housed additional occupants that could impose a threat to the officers' safety." *Id.* at 1331. In *Wiga*, the officers "could *not* determine with any certainty whether other occupants aside from Wiga and Moody were present." *Id.* (emphasis added). In the matter before us, the officers reasonably believed that there were at least four other persons involved in the narcotics transaction who were not accounted for. Thus, the articulated facts justifying an entry to search for other persons are, if anything, stronger in the instant matter than those before this court in *Wiga*.

---

defendant might be in the vicinity. *Id.* Unlike *Whitten,* in this case Hoyos attempted to escape arrest by entering the house. In addition, the officers testified that they were aware that several suspects had not yet been arrested and could possibly be in the area of the Starbuck residence.

We agree with our dissenting colleague that in *Payton v. New York*, 445 U.S. 573, 585, 100 S.Ct. 1371, 1379, 63 L.Ed.2d 639 (1979) the Supreme Court reminded us that " 'physical entry of the home is the chief evil against which the working of the Fourth Amendment is directed.' " (quoting *United States v. United States District Court*, 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972)). In *Payton*, however, the narrow issue before the Supreme Court was a challenge to "the constitutionality of New York statutes that authorize police officers to enter a private residence without a warrant and with force, if necessary, to make a routine felony arrest." *Id.* 445 U.S. at 574, 100 S.Ct. at 1373. The court was *not* faced with the question whether exigent circumstances would justify entry into a home without a warrant of arrest or search. In fact, the Court noted that "it is arguable that the warrantless entry to effect Payton's arrest might have been justified by exigent circumstances...." *Id.* at 583, 100 S.Ct. at 1378. The Court stated that this justification for an entry to make an arrest without a warrant was not before it because "none of the New York courts relied on any such justification." *Id.* In the matter before us, the district court did rely on exigent circumstances to justify the protective sweep. Thus, unlike the posture of the case before the Supreme Court in *Payton*, the issue is squarely before us. The court in *Payton* recognized that while "searches and seizures inside a home without a warrant are presumptively unreasonable[,]" *id.* at 586, 100 S.Ct. at 1380, an *entry* to make a search or seizure within a suspect's premises is reasonable if "the police can show that it falls within one of a carefully defined set of exceptions based on the presence of 'exigent circumstances.' " *Id.* at 586 n. 25, 100 S.Ct. at 1380 n. 25.

A protective sweep inside a suspect's premises has been defined in this circuit as an exception to the Fourth Amendment's warrant requirement to prevent physical harm or the destruction of evidence. *Alfonso*, 759 F.2d at 741–43. The dissent suggests that if we permit officers to enter a home to make a protective sweep when the arrest occurs outside we will increase the danger to police because "[i]f police readily may enter a house after an arrest outside, occupants may be more likely to use force to ward off intrusion." Dissent at 1401. There is no factual basis for this speculation. Our duty is to determine, on a case by case basis, whether the record shows that officers were aware of articulable facts that justified an entry without a warrant. *Wiga*, 662 F.2d at 1330. Such facts existed in this case.

The dissent also speculates that the majority's conclusion that a protective sweep was justified under the unique facts articulated by the officers in this case, would result in a decision in some future case that "any arrest within gunshot range of a house may itself generate exigent circumstances justifying entry." Dissent at page 1401. Nothing stated in this opinion would support this supposition. It should be noted initially that the dissent does not define "gunshot range." Hoyos was arrested as he was pulling open the screen door. Thus, the arresting officers were within a few inches of persons who might be hiding with drawn weapons on the other side of the door. It seems evident that an officer's life is threatened at this distance even if his hidden assailant is a poor or inexperienced marksman.

If ever a case is presented to this court wherein a protective sweep is upheld by the district court solely because the officers were within "gunshot range of a house," but not immediately outside a door at point blank range, we will have the duty to decide that matter on the totality of the circumstances presented therein. We are confident that in the hypothetical case suggested by the dissent, the obvious distinction between the danger posed by a weapon that may be fired at an officer from a distance of a few inches as opposed to the more remote threat of harm where an arrest is made at the outer limits of "gunshot range" will be fully litigated by the opposing parties.

The dissent cites *Vale v. Louisiana*, 399 U.S. 30, 33–34, 90 S.Ct. 1969, 1971, 26 L.Ed.2d 409 (1970), for the proposition that

the Supreme Court "originally limited protective sweeps quite narrowly". Dissent at 1401. *Vale* contains no limitation on protective sweeps. In *Vale,* the prosecution did not attempt to justify the warrantless entry as a protective sweep. Instead, the state of Louisiana argued that the *search* of the house for physical evidence was justified *as an incident to a lawful arrest* that occurred outside. *Id.* at 33, 90 S.Ct. at 1971. Relying on *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), the Supreme Court in *Vale* concluded that the search of a rear bedroom for *narcotics* was not substantially contemporaneous or within the immediate vicinity of the *arrest* of a person outside the house. *Id.* 399 U.S. at 33, 90 S.Ct. at 1971.

In *Vale,* the Supreme Court rejected the Louisiana Supreme Court's conclusion that the search was "independently supportable because it involved narcotics, which are easily removed, hidden, or destroyed[,]" because the record showed that "the arresting officers satisfied themselves that no one else was in the house when they first entered the premises." 399 U.S. at 34, 90 S.Ct. at 1971–72. The Court noted that the State had failed to present evidence to show the existence of an "exceptional situation" justifying a *search* without a warrant. *Id.* Thus, *Vale* can be read as some indication that an entry to prevent the destruction of evidence *after* an arrest outside would be proper if the prosecution meets its burden "to show of the existence of such an exceptional situation." *Id.*

The protective sweep issue has not yet been presented for decision to the Supreme Court in any case. For that reason, the Court has not been called upon to consider the merits of the rule adopted in this circuit permitting an entry if articulable facts justify a search for *persons* within a building. As noted above, however, in *Payton,* the Supreme Court stated that it was "arguable" the entry might have been justified by "exigent circumstances" and in *Vale* the Court rejected justification of an entry to avoid destruction of evidence because the record did not support the presence of "exceptional circumstances." We do not think the court's observations in *Payton* and

*Vale* can fairly be construed as a disapproval of the law of this circuit. In short, contrary to the view expressed in the dissent, the Supreme Court's comments in *Vale* and *Payton* concerning exigent or exceptional circumstances would appear to support our decisions in *Wiga* and *Alfonso.*

Based on all the facts known to the investigating and arresting officers, the protective sweep of the residence was fully justified.

### III.

### VALIDITY OF THE SEARCH WARRANT

■ Hoyos contends that the search warrant was invalid because it was issued based on evidence observed during an unlawful warrantless entry into the Starbuck residence. As explained above, Hoyos' arrest and the initial entry into the house were lawful. Accordingly, the evidence observed in plain view during the protective sweep of the house was properly used to support the issuance of a search warrant.

### IV.

### THE MOTION TO WITHDRAW THE GUILTY PLEA

■ Hoyos argues that the district court erred in denying his motion to withdraw his guilty plea. He contends that this motion should be freely granted because it was made prior to sentencing. He also argues that he was upset at the time that he entered his guilty plea and was not thinking clearly. He asserts that his meeting with his attorney regarding the plea was only 30 minutes long. He claims that his attorney advised him to admit things just to get the plea accepted. Finally, he contends his attorney failed to advise him fully on whether certain evidence would be admissible against him.

■ We review a district court's decision to grant or deny a motion to withdraw a guilty plea for abuse of discretion. *United States v. Read,* 778 F.2d 1437, 1440 (9th Cir.1985), *cert. denied,* 479 U.S. 835, 107

S.Ct. 131, 93 L.Ed.2d 75 (1986); *United States v. Castello,* 724 F.2d 813, 814 (9th Cir.), *cert. denied,* 467 U.S. 1254, 104 S.Ct. 3540, 82 L.Ed.2d 844 (1984). We have previously held that trial judges should freely allow withdrawal of a guilty plea prior to sentencing. *Read,* 778 F.2d at 1440. A guilty plea after sentencing will not be set aside unless a manifest injustice would result. *United States v. Baker,* 790 F.2d 1437, 1438 (9th Cir.1986). An attempt to withdraw a guilty plea before sentencing, but after a co-defendant has been sentenced "is akin to that of a defendant who seeks to withdraw his plea after sentencing." *United States v. Kay,* 537 F.2d 1077, 1078 (9th Cir.1976) (per curiam).

The district court did not abuse its discretion in refusing to grant Hoyos' motion to withdraw his guilty plea. Hoyos submitted a declaration in support of his motion to withdraw his plea of guilty in which he alleged that he was upset and tearful during his discussion with the court. Hoyos testified at the hearing on this motion. At the conclusion of these proceedings, the court expressly found that Hoyos was not a truthful person and discredited his testimony. The court also found that at the time of the entry of his plea Hoyos appeared to be "calm and not tearful."

Hoyos stated at the time of his plea that his attorney had fully informed him of his rights, that he had had adequate time to meet and discuss the plea, and that no one had told him how to answer the questions or to admit anything he had not done. Luis De La Cruz, Hoyos' attorney at the time the guilty plea was taken, testified at the hearing on the motion to withdraw. De La Cruz testified that during a discussion with Hoyos on Wednesday, November 25, 1986, he fully informed Hoyos of all of his rights, including the existence of evidence that could or could not be presented against him and the maximum sentence he could receive. He stated that he told Hoyos that if he pled guilty he should answer all of the court's questions truthfully. In addition, he told Hoyos that he had until the end of that week to decide whether to change his plea to guilty.

The trial judge was entitled to credit Hoyos' testimony at the time he entered the plea and to disbelieve the allegations in the affidavit in support of the motion to withdraw the guilty plea. *Castello,* 724 F.2d at 815. Finally, the motion for withdrawal of the plea was filed after Hoyos had learned that one of his co-defendants, who pleaded guilty, had been sentenced to 10 years and another, who had gone to trial, had been found not guilty. Hoyos failed to present evidence establishing that manifest injustice would result if he was not allowed to withdraw his guilty plea. The district court did not abuse its discretion in denying Hoyos' motion to withdraw his guilty plea.

AFFIRMED.

BEEZER, Circuit Judge, concurring in part and dissenting in part:

After arresting Hoyos police officers broke the lock on his front door and entered his house to perform a protective sweep. Breaking in to search a house after a lawful arrest outside is qualitatively different from searching a house after a lawful arrest inside. Case law regarding protective sweeps does not justify the officers' decision to enter and conduct a warrantless search of Hoyos's house.

## A

Whether there is a distinction between protective sweeps after arrest inside and outside a house has been an open question.[1] The sound logic of the Fourth Amendment compels a distinction. As the Supreme Court repeatedly has recognized, " 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.' " *Payton v. New York,* 445 U.S. 573, 585, 100 S.Ct. 1371,

---

1. In particular, the Supreme Court has never decided the question. Most recently, in *Segura v. United States,* 468 U.S. 796, 804, 104 S.Ct. 3380, 3385, 82 L.Ed.2d 599 (1984), the Court declined to address the Second Circuit's conclusion that exigent circumstances did not justify a search after arrest outside the residence; the government had dropped its argument to the contrary.

1379, 63 L.Ed.2d 639 (1979) (quoting *United States v. United States District Court*, 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972)). Or, as we said recently in *United States v. Winsor*, 846 F.2d 1569, 1574 n. 5 (9th Cir.1988) (en banc), "The sanctity of the home enjoys special solicitude in Fourth Amendment jurisprudence. That solicitude springs from the language of the Amendment itself, which specifically guards the 'right of the people to be secure in their ... houses.' "

When a lawful arrest occurs inside a house, the arrest itself reduces the owner's expectation of privacy: further exploration of the house under exigent circumstances affects privacy as a matter of degree. By contrast, when an arrest occurs outside a house, the owner maintains his original high expectation of privacy. Entry into the house affects privacy as a matter of magnitude: the state's enforcement officers breach the threshold drawn by the Court so clearly in *Payton*.

A court may establish the "reasonableness" of an officer's conduct only by balancing the exigent circumstances supporting a protective sweep against the privacy interests opposing a sweep. By implication from *Payton*, privacy interests opposing a sweep are greater insofar as the sweep involves entering a house. Whether the arrest occurs inside (so entry is not an issue) or outside (so it is) *does* affect the reasonableness of the officer's conduct. On occasion, exigent circumstances may justify a protective sweep inside after police make an arrest outside, but not as often as when police already have entered the house to make a lawful arrest.

A distinction between arrest inside and arrest outside also has a logical basis in the exigent circumstances side of the reasonableness balance. A prominent factor in exigent circumstances is safety. Police making an arrest inside a house are likely to face grave, immediate danger from others within. Police making an arrest outside ordinarily do not face the same kind of danger. Hence exigent circumstances are less compelling insofar as a protective sweep involves entering a house. Again, whether the arrest occurs inside or outside does affect the reasonableness of an officer's conduct.

A rule giving police the same scope to search a house after an arrest outside might have the aggregate effect of making police less safe, not more safe. If police readily may enter a house after an arrest outside, occupants may become more likely to use force to ward off the intrusion. The occupants' added incentive to use force increases the possibility that they will endanger police or others. This possibility in turn increases the exigency of the circumstances, giving police more reason to enter the house, giving occupants more incentive to use force, and so on. The result is that any arrest within gunshot range of a house may itself generate exigent circumstances justifying entry—a result probably not contemplated by Fourth Amendment law today.

In keeping with the logic of the Fourth Amendment, the Supreme Court originally limited protective sweeps quite narrowly. As the Court said in *Vale v. Louisiana*, 399 U.S. 30, 33–34, 90 S.Ct. 1969, 1971–72, 26 L.Ed.2d 409 (1970), "If a search of a house is to be upheld as incident to an arrest, that arrest must take place *inside* the house, not somewhere outside—whether two blocks away, twenty feet away, or on the sidewalk near the front steps." 399 U.S. at 33–34, 90 S.Ct. at 1971–72 (emphasis in original, citations omitted). Entry would be proper only if the prosecution met its burden "to show the existence of ... an exceptional situation." *Id.* at 34, 90 S.Ct. at 1971–72. The Court listed the exceptional situations:

> There is no suggestion that anyone consented to the search. The officers were not responding to an emergency. They were not in hot pursuit of a fleeing felon. The goods ultimately seized were not in the process of destruction. Nor were they about to be removed from the jurisdiction.

*Id.* at 35, 90 S.Ct. at 1972 (citations omitted). The facts of this case do not fit any of these situations.

## B

In accordance with the Court's analysis in *Vale*, the Ninth Circuit has created a hybrid out of the doctrines of exigent circumstances and search incident to arrest. The majority states our standard, "Officers who have effected an arrest at a residence may conduct a limited search for persons who may destroy evidence or pose a threat to the officers' safety, if the officers can point to articulable facts that support their belief that others may be on the premises." Maj. Op. at 1396. The people that officers believe to be on the premises, of course, must be the same ones who might destroy evidence or pose a threat. *See United States v. Whitten*, 706 F.2d 1000, 1014 (1983).

The officers in this case cannot point to articulable facts supporting a belief that anyone else might have been in the house. The facts the officers recount are that Hoyos tried to get back inside, that a large amount of cocaine had been seized, and that four people were seen outside the residence. The first fact is irrelevant. The inference from Hoyos's run for the door is that he was trying to escape, not that others were in the house.[2] The second fact is irrelevant as well. A cocaine seizure far away does not suggest the presence of persons in Hoyos's house, regardless of whether co-conspirators might still be at large.

The third fact is relevant but insufficient. We have never found the mere presence of persons outside a residence to support a belief that others might be inside. In *United States v. Wiga*, 662 F.2d 1325 (9th Cir.1982), the agents knew at least one other person was in the motor home, even though Wiga had lied to the contrary. After the other person emerged the agents had reason to believe still more people might be inside the vehicle. 662 F.2d at 1331. Our case would be equivalent only if

the officers knew at least one other person was in the house, they asked Hoyos if anyone was there, he lied to the contrary, then someone emerged.[3] Lacking any such basis, the officers' belief that other people might be inside was patently unreasonable.

Other testimony indicates that the officers did not even rely on articulable facts. At trial the following exchange occurred between counsel and Deputy Rodella: "Q. Did you have any indication that there were other people inside? A. No, sir." In light of this statement, facts the officers purported to rely on could not sustain a reasonable belief that others might be in the house—much less with a mind to destroy evidence or jeopardize the officers' safety.

Only destruction of evidence or danger to the officers can create exigent circumstances justifying entry. Here destruction of evidence does not suffice. In *United States v. Whitten* we held that circumstances similar to those in this case did *not* amount to exigent circumstances. 706 F.2d at 1016. Most important, we stated that destruction of evidence must appear imminent or in the process to qualify as exigent circumstances justifying entry:

> The court below found exigent circumstances based upon danger of destruction of evidence, flight, and danger to the arresting officers. There was no evidence of imminent danger of destruction of evidence in the room; one of the officers testified that he had no information that Gaiefsky was in the process of destroying evidence and did not know whether anyone else was in the room.

706 F.2d at 1016. Similarly, in *Vale v. Louisiana* the Supreme Court required destruction "in the process." 399 U.S. at 35, 90 S.Ct. at 1972. *See also Cupp v. Murphy*, 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973) (exigent circumstances where no

---

2. The government does not claim the officers entered the house in hot pursuit. *Compare United States v. Stubblefield*, 621 F.2d 980, 982 (9th Cir.1980).

3. *Wiga* is weak authority for another reason: the case, dealing with the search of a motor home, is a sport. Though the court in *Wiga*

stated that "the 'automobile exception' is inapplicable to a motor home," 662 F.2d at 1329, the court painstakingly applied law dealing with automobiles—as well as that dealing with residences—to uphold the entry under exigent circumstances. *See* 662 F.2d at 1331–32.

arrest, evidence on person in process of being destroyed).

In this case the facts do not suggest destruction of evidence was in the process or was imminent. As noted above, the officers had no indication anyone was inside, much less anyone who would destroy evidence. By way of contrast, in *United States v. Alfonso*, 759 F.2d 728, 741 (9th Cir.1985), police saw suspects through an open door into the hotel room. In addition, police heard a "hurried scuffling noise" coming from the bathroom. 759 F.2d at 743. Circumstances like these, indicating destruction of evidence, do not occur in our case.

The facts do not even suggest evidence was likely to be present. Hoyos's house was the Starbuck residence. The officers had no reason to believe any evidence was in the Starbuck residence; the only place where they had seen drugs loaded and unloaded was the Eagle's Nest residence, which had a reputation as a safe house for storing drugs.

In this connection, *United States v. Impink*, 728 F.2d 1228, 1231 (9th Cir.1984) is controlling. We have described *Impink*'s rule as follows: "to establish exigent circumstances due to possible destruction of evidence there must be probable cause to suspect that evidence is present on the premises; mere suspicion that evidence may be present cannot justify warrantless entry." *Alfonso*, 759 F.2d at 743. Nobody has argued the police had probable cause to suspect evidence was present in the Starbuck residence at the time of Hoyos's arrest; the search warrant issued later was based on information obtained during the protective sweep. *Compare Segura v. United States*, 468 U.S. 796, 814, 104 S.Ct. 3380, 3390, 82 L.Ed.2d 599 (1984) (independent source of information for affidavit). Without this information probable cause would have been lacking. *See United States v. Alexander*, 761 F.2d 1294, 1299–1300 (9th Cir.1985) (test for warrant obtained by tainted affidavit). As the district

court found, "If the entry to the house is no good, the warrant is no good." The officers might have had a suspicion that evidence was present, but mere suspicion "cannot justify warrantless entry." *Alfonso*, 759 F.2d at 743.

Precedent indicates not only that destruction of evidence was insufficient to create exigent circumstances, but also that danger to the officers was insufficient. In *United States v. Jackson*, 700 F.2d 181, 189 (5th Cir.1982), for instance, the rationale for entry was danger. The circumstances in our case differ materially from those in *Jackson*. Here the officers had no information indicating that anyone would be in the house, much less anyone who might be armed. In *Jackson*, by contrast, the agents had grounds to believe other persons present might entail danger because a suspect had told the agents that the two other participants were armed; even after arresting two unarmed suspects, the agents could point to articulable facts supporting their belief that other, armed suspects might be present.

The circumstances here are a far cry from those surrounding a search we upheld in *Whitten*.[4] There the facts suggested a serious danger to the officers' safety from armed members of the drug ring (believed to be in the same remote area) or from an explosion. 706 F.2d at 1014. The danger to the officers' safety was great enough and immediate enough that their protective sweep was likely to reduce, rather than raise, the overall level of danger. Our case is different. The facts do not suggest serious danger. Hoyos and the women, including his wife and mother, were unarmed, and the officers did not have information that co-conspirators elsewhere were armed or that the house contained weapons. Whatever danger the officers might have thought they faced, they necessarily exposed themselves to greater danger by breaking into the house: when Deputy Rodella broke the lock with a hand-held ram, any persons inside would have become

---

**4.** This search is separate from another search, discussed before, that we struck down in *Whit-* ten. *See* 706 F.2d at 1016.

afraid themselves and would have had time and notice to prepare an attack on the officers.

Finally, in *Wiga* we invoked law dealing with residences to establish that agents had a "legitimate concern that other occupants may have been concealed within the motor home." 662 F.2d at 1333. But to explain why those occupants might have posed a danger to the officers—a danger justifying the sweep—we invoked law dealing with automobiles, not residences. In particular, we quoted a rule from *United States v. Berryhill*, 445 F.2d 1189 (9th Cir.1971):

> It is inconceivable that a peace officer effecting a lawful arrest of an occupant of a vehicle must expose himself to a shot in the back.... All companions of the arrestee within the immediate vicinity, capable of accomplishing a harmful assault on the officer, are constitutionally subjected to the cursory 'pat down'.

*Wiga*, 662 F.2d at 1332 (quoting *Berryhill*, 445 F.2d at 1193). On this basis we concluded that the "sweep of the motor home was a reasonable search incident to Wiga's arrest." 662 F.2d at 1333.

In *Wiga* the protective sweep stands on a search incident to arrest theory applied to a vehicle. In our case the protective sweep stands on its own. The officers may not cite a per se rule that establishes danger making up exigent circumstances. To enter the house, the officers needed an independent basis for their reasonable belief that someone on the premises might pose a threat to their safety. No independent basis exists.

C

The Fourth Amendment's reasonableness test balances privacy interests against exigent circumstances. Both sides of the balance favor a distinction between a protective sweep after arrest outside a house and a protective sweep after arrest inside a house. The distinction is especially keen when, as in this case, officers break through a locked door to conduct their protective sweep.

Regardless of such a distinction, case law does not justify the officers' decision to enter Hoyos's house. The officers cannot point to articulable facts supporting a belief that anyone else might have been in the house, much less anyone who would destroy evidence or pose a threat to the officers' safety.

I concur in parts I and IV of the majority's opinion, but I dissent from parts II and III. The protective sweep of Hoyos's house was an unreasonable search. Because the search warrant was based on evidence discovered during the protective sweep, the warrant was invalid. I would reverse the conviction, remand the case for trial, and instruct the district court to exclude evidence from Hoyos's house.