15 F.3d 1092
NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Javier LEON-CORRALES, Defendant-Appellant.
 No. 92-50634.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Oct. 7, 1993.
Decided Feb. 3, 1994.
 
 1
 Before: FLETCHER, D.W. NELSON, Circuit Judges, and WILL,* District Judge.
 
 
 2
 MEMORANDUM**
 
 
 3
 After pleading not guilty to two counts of possession with intent to distribute cocaine and one count of conspiring to distribute narcotics, Javier Leon-Corrales filed a motion to suppress evidence and a request for a Franks hearing. Both were denied. Leon-Corrales' case went to trial in June 1992, and the jury deadlocked on the counts against him. The government then filed a superseding information charging him with one count of conspiracy to possess and distribute cocaine, in violation of 18 U.S.C. Sec. 371 and 21 U.S.C. Sec. 841(a)(1). Appellant pled guilty, and was sentenced to 60 months in custody and five years of supervised release. His guilty plea was conditional, reserving the right to appeal the district court's denial of his motion to suppress.
 
 
 4
 That motion challenged, among other things, the legitimacy of the warrant search of an apartment on Otis Avenue in Bell, California, and the warrantless sweep of the same apartment; both issues are raised again on appeal. We have discussed those issues thoroughly and have affirmed the district court in a memorandum disposition filed concurrently with this order. United States v. Felix, No. 92-50525. For the reasons set forth therein, we also affirm the district court's denial of the Leon-Corrales' motion to suppress, to the extent that the same issues were raised there.[1] We confine the balance of our discussion here to matters unique to Leon-Corrales' appeal and his motion below: his own warrantless arrest, and the subsequent search of an apartment on Cabell Avenue.
 
 1. Appellant's Arrest
 
 5
 We assume familiarity with the facts described in United States v. Felix, which form the relevant background to appellant's arrest. On January 14, 1992, at approximately 2:00 p.m., appellant was seen leaving the Otis apartment in the company of Ortiz and a person later identified as co-defendant Cristino Jacobo. Ortiz sat in the front passenger seat and Leon-Corrales drove, using counter-surveillance methods. He drove to within two blocks of Benji's Auto Sales, where Ortiz got out; Ortiz later left Benji's in a blue vehicle which he drove in a counter-surveillance manner to an apartment on Evergreen Avenue, and then back to Otis Avenue. Leon-Corrales and Jacobo continued on to a residence on Cabell Avenue in Bellflower, California. Leon-Corrales checked his mirrors many times, "as if looking for a tail." Gutierrez Decl, exh. 2 at 2. At 3:55 p.m., Leon-Corrales and Jacobo drove back to Otis Avenue, passing the Otis apartment several times before parking just west of Otis Avenue. As they walked to the apartment, appellant "looked up and down the street and at passing vehicles as if looking for someone." Id. Around 4:00 p.m., Oritz entered the apartment. After approximately half an hour, Ortiz, in a red Cougar, headed for a drug deal, after which he was arrested. At about 7:50 p.m., Leon-Corrales and Jacobo left the apartment, tried to drive off in the pickup they had been driving earlier, and were arrested. In the pickup truck police found, among other potentially incriminating items, a drug ledger matching a ledger later found in the Otis apartment.
 
 
 6
 2. Search Warrant for the Cabell Avenue Residence
 
 
 7
 The relevant sections of a search warrant affidavit sworn out by Officer Gutierrez state that appellant was arrested for a drug offense; repeat several of the facts leading to the arrest; and describe police communications with Veronica Garcia, said to be appellant's common-law wife. Garcia stated that she and appellant were living together, but denied that they still lived at the McNerney Avenue address given by appellant at his booking. Garcia refused to confirm that the couple lived at the Cabell residence. The day after her police interview, according to the affidavit, a grey Toyota, which Garcia had been driving on the day of the drug deal, was spotted in the driveway of the Cabell Avenue house. Officer Gutierrez concluded in his affidavit that Garcia and appellant lived at the Cabell Avenue location, but were "attempting to keep it a secret." Search Warrant Aff. at 6.
 
 
 8
 A search warrant for the Cabell location was issued by a state court judge. Police found $42,000 in a secret compartment in the garage, and three drug ledgers.
 
 DISCUSSION
 1. Appellant's Arrest
 
 9
 Officers have probable cause to make a warrantless arrest if, at the time of the arrest, facts and circumstances within their knowledge and of which they have reasonably trustworthy information are sufficient to warrant a prudent person in believing that the arrested person has committed or is committing an offense. See, e.g., United States v. Hillison, 733 F.2d 692, 697 (9th Cir.1984). Determination of probable cause is a mixed question of law and fact. Legal issues are reviewed de novo; the underlying facts as found by the district court are reviewed for clear error. United States v. Hoyos, 892 F.2d 1387, 1392 (9th Cir.1989), cert. denied, 498 U.S. 825 (1990).
 
 
 10
 Appellant argues that in his case, none of the usual indicia of drug trafficking were presented to the officers at the time of his arrest. He argues that there were "no transfers, no car switches involving the defendant, no cellular phone calls or beeper calls or even pay telephone calls, no heavily laden vehicles indicating the transport of drugs, and no tips by informants." Appellant's Brief at 25. Appellant stresses that "mere propinquity with known criminals does not, without more, give rise to probable cause," Ybarra v. Illinois, 444 U.S. 85, 89 (1979), reh'g denied, 444 U.S. 1049 (1980), and contends that a reasonable person observing his activity on January 14 would have concluded that he was engaged in innocent social interaction, and not in drug dealing.
 
 
 11
 Examination of the record, however, reveals that a reasonable officer would have been warranted in drawing just the opposite conclusion. Using counter-surveillance methods, appellant drove a person the police knew by the time of appellant's arrest was a drug dealer to a location where that person switched vehicles for the third time that day. Appellant then drove to another location, all the time looking out for a tail. Later, he drove back and forth in front of the apartment which the known drug dealer had visited several times that day; when he parked and walked to the residence, he peered at cars and passersby as if searching for someone. For three and a half hours, he remained in the apartment from which the drug dealer had departed for the drug transaction; then he left.
 
 
 12
 This combination of circumstances may usefully be compared with those before the court in United States v. Arias, 923 F.2d 1387 (9th Cir.1991), certs. denied sub nom. Gonzales v. United States, 112 S.Ct. 130 (1991), 112 S.Ct. 217 (1991). In Arias, defendant picked up, and drove in a counter-surveillance manner, a car left at a restaurant by two brothers who were suspected to be drug dealers. Defendant drove the car to two locations; at the second, the brothers picked it up. The car was found to contain 20 kilograms of cocaine. 923 F.2d at 1388. The court held that there was probable cause to arrest appellant.
 
 
 13
 In this case, although Leon-Corrales did not participate directly in a car switch, he did drive a known drug dealer to a place where the drug dealer switched cars; throughout that transaction, and indeed throughout the day, appellant used counter-surveillance driving techniques or showed signs of concern that he was being followed.[2] Given the counter-surveillance driving, it is very difficult to reconcile his role in the car switch with mere social interaction, and in any event his repeated signs of anxiety, and the fact that he was seen hovering at the margins of a major drug deal throughout the day warrant the belief that his involvement was less than innocent, and that he himself was committing an offense. Additionally, as the court stated in Hillison, 733 F.2d at 697, probable cause can more easily be derived from a starting point of association with criminals when the association is contemporaneous with known criminal activity. Here, appellant's involvement with Ortiz and the Otis apartment neatly dovetailed the life of the drug deal. This factor furnishes additional evidence in support of the district court's finding of probable cause, which we affirm.
 
 2. Search of the Cabell Avenue Residence
 
 14
 Appellant concedes that under the law of this Circuit, a sufficient nexus exists between suspected drug traffickers and their residences to establish probable cause to search the residences, at least when the relevant facts are presented to the issuing magistrate accompanied by the expert testimony of a police officer. United States v. Ayers, 924 F.2d 1468, 1479 (9th Cir.1991). Appellant contends, however, that Officer Gutierrez did not sufficiently establish that the Cabell Avenue apartment was appellant's home.
 
 
 15
 As set forth above, Gutierrez' search warrant affidavit states that at his booking appellant said that he lived on McNerney Avenue; that Garcia, his common-law wife, said that she lived with him, but not there; that Garcia refused to confirm that the couple lived on Cabell Avenue; and that a car Garcia had been driving was seen at the Cabell Avenue residence the day after her police interview.
 
 
 16
 In Ayers, the defendant raised a challenge to the validity of a search of his residence similar to the one raised here, arguing that at the time the police executed the warrant, they had been told that he no longer lived there. The court rejected this argument, noting that defendant himself had told the police that he lived at the location searched, and that independent police investigation, i.e., checking defendant's license, also supported that conclusion.
 
 
 17
 The first of the Ayers circumstances is clearly not present in Leon-Corrales' case; the second, however, does exist, although in somewhat attenuated form. Between appellant's answers and those of Garcia, the police were unable to get any clear statement about where appellant lived, since Leon-Corrales and Garcia contradicted one another. These contradictions themselves suggested that appellant and Garcia were being untruthful; the appearance of a car Garcia had been driving outside the Cabell residence provided at least some additional support for the conclusion that the two were lying.
 
 
 18
 Moreover, other factors indicated that the Cabell location may have contained crime evidence even if it was not appellant's residence: appellant's anxious driving en route to the location, and the fact that he drove there directly after having given a ride to a known drug dealer. We conclude that all of these factors taken together were sufficient to justify a finding of probable cause.
 
 
 19
 AFFIRMED.
 
 
 
 *
 Honorable Hubert L. Will, Senior United States District Judge for the Northern District of Illinois, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this Circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 As with Felix, we assume without deciding that Leon-Corrales had a protectable Fourth Amendment interest in the Otis Avenue apartment. We are unwilling to assume that he had a Fourth Amendment interest in co-defendant Felix's arrest, which he also challenges on appeal. This conclusion makes little practical difference, however, since the "fruits" of the arrest are identical to or a subset of the "fruits" of the warrantless sweep
 
 
 [2]
 Appellant challenges the assertion that he drove in a counter-surveillance manner, arguing that Officer Quinn, who testified on this point at the suppression hearing, was able to say only that appellant had run one stop sign and had exceeded the speed limit, while the list of counter-surveillance techniques, by Quinn's own description, include a great many other maneuvers. The officer need hardly have witnessed each of these techniques, however, in order to determine that the suspect was driving evasively